**Edward SANCHEZ and Raul X. Villarreal as Guardian of Christine Lisa Sanchez, Appellants/Cross–Appellees,**

v.

**MICA CORPORATION, Appellee/Cross– Appellant.**

**M & M Contracting of Texas, Inc., Appellee,**

v.

**Spaw–Glass, Inc. and Sylvia Estrada, Cross–Appellees.**

No. 04–01–00643–CV.

Court of Appeals of Texas, San Antonio.

Dec. 11, 2002.

Rehearing Overruled Jan. 24, 2003.

Harry S. Bates, Thomas C. Hall, Hall & Bates, L.L.P., Henry B. Gonzalez, Jr., Law Offices of Henry B. Gonzalez, San Antonio, for appellants.

Richard F. Werstein, Bret L. Walton, Werstein, Smith & Wilson, Luis R. Vera, Jr., LYvonne Brittingham, Law Offices of Luis R. Vera, Jr., & Associates, Ricardo R. Reyna, Brock & Person, P.C., Nissa M. Sanders, Crofts & Callaway, P.C., San Antonio, Michelle E. Robberson, R. Brent Cooper, Diana L. Faust, Cooper & Scully, P.C., Dallas, Ross Pringle, Thomas J. Mitchell, III, Wright & Greenhill, P.C., Austin, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice.

Opinion by: PHIL HARDBERGER, Chief Justice.

This case demonstrates the uncertainty of life in even the most commonplace of activities. It also raises several legal questions involving settlement credits, a juror's bias, the jury charge, and legal and factual sufficiency issues. The facts are compelling.

A woman named Betty Jean Sanchez was an employee at the downtown campus of the University of Texas at San Antonio ("UTSA"). As she was walking to work, Mrs. Sanchez approached an area of sidewalk in which an electrical pull box was embedded. The pull box is designed for people to walk on as a part of the sidewalk. This pull box, however, had an electrical fault which made it electrically live and extremely dangerous. When Mrs. Sanchez stepped on it, she was killed on the spot. How such an awful thing could have happened was the subject of the lawsuit.

Edward Sanchez and Christine Sanchez, the appellants ("Sanchezes"), are Mrs. Sanchez's children, who were 18 and 14, respectively, when Mrs. Sanchez died. The Sanchezes sued a number of contractors and subcontractors, City Public Service ("CPS"), and the Texas Department of

Transportation ("TxDOT"). A third plaintiff, Sylvia Estrada, also brought suit. Estrada was present when Mrs. Sanchez was electrocuted and was electrically shocked when she attempted to assist Mrs. Sanchez.

CPS and TxDOT settled the claims against them before trial for $2,500,000 and $8,000, respectively. A jury found four entities negligent, but did not find a fifth general contractor, Spaw–Glass, Inc., negligent. The jury allocated the percentage of negligence as follows: (1) CPS—15%; (2) M & M Contracting—30%; (3) MICA—50%; and (4) TxDOT—5%. The jury awarded the Sanchezes $7,590,000 in damages, including $340,000 for loss of inheritance. The jury awarded Estrada $303,000. The trial court determined that M & M and Mica were entitled to a dollar-for-dollar settlement credit in the amount of $2,508,000 with regard to the Sanchezes' settlements with CPS and TxDOT. The trial court also determined that the damages awarded for loss of inheritance should be reduced to $106,000. The net judgment awarded in favor of the Sanchezes was $4,848,000. The trial court determined that M & M and Mica were entitled to a dollar-for-dollar settlement credit in the amount of $7,500 with regard to Estrada's settlements. The net judgment awarded in favor of Estrada was $242,400.

The Sanchezes present two issues on appeal, contending the trial court erred by: (1) granting a settlement credit for the portion of the CPS settlement allocated to punitive damages; and (2) reducing the jury's award for loss of inheritance damages. Mica presents four issues in its cross-appeal, contending: (1) the trial court erred in refusing to strike a juror for bias; (2) the evidence is legally and factually insufficient to support the jury's finding on Mica's negligence; (3) the trial court erred in denying Mica's request for a jury question on the statute of repose and for a jury instruction on new and independent cause; and (4) the damages awarded to the Sanchezes for loss of companionship and society and mental anguish ($7,000,000) and the damages awarded to Estrada for physical pain and mental anguish ($300,000) were excessive. We affirm the trial court's judgment.

## I. SANCHEZES' APPEAL (TWO ISSUES)

### SETTLEMENT CREDIT

 Mica elected to have the court reduce the amount of damages to be recovered by the Sanchezes by the sum of the dollar amount of all settlements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997). "A defendant seeking a settlement credit has the burden to prove its right to such a credit." *Utts v. Short,* 81 S.W.3d 822, 828 (Tex.2002). A defendant meets this burden by showing, in the settlement agreement or otherwise, the amount of the settlement credit. *Id.* "Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement's allocation." *Id.* In order "to limit a nonsettling party's dollar-for-dollar settlement credit to an amount representing actual damages, the settling party must tender a valid settlement agreement allocating between actual and punitive damages to the trial court *before judgment.* Otherwise, the nonsettling party is entitled to a credit equaling the entire settlement amount." *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 928 (Tex.1998) (emphasis added). This allocation is important because a defendant cannot receive a credit for settlement amounts allocated to punitive damages. *See id.* at 927; TEX. CIV. PRAC. & REM.CODE ANN. § 33.002(c)(2) (Vernon 1997).

When a case involves facts suggesting that the settlement transaction or allocation is a sham, the nonsettling defendant has the burden of presenting evidence of the sham as part of its burden in electing a dollar-for-dollar credit. *Utts*, 81 S.W.3d at 829. The evidence may be presented before or after the jury's verdict; however, "the trial court should resolve the issue before it submits the case if the nonsettling defendant so requests." *Id.* Once the nonsettling defendant presents evidence of a sham, the trial court must presume the entire settlement credit applies unless the plaintiff presents evidence to overcome this presumption. *Id.*

At the request of several defendants, the trial court conducted a hearing on the settlement credit issue after all parties had closed and the case was ready to be submitted to the jury. Prior to that hearing, a copy of a handwritten Rule 11 agreement between CPS and the Sanchezes was submitted to the court. The Rule 11 agreement satisfied the defendants' burden to show the amount of the settlement. The burden then shifted to the Sanchezes to present evidence of the allocation. If the Sanchezes met that burden, the burden would shift back to the defendants to prove that the allocation was a sham.

The Rule 11 agreement provided that the plaintiffs had the right to allocate the settlement funds among and between the estate and the children. The agreement also provided that the plaintiffs had the right to allocate the funds among damages, including punitive damages. The day after the Rule 11 agreement was signed, the plaintiffs' lawyer sent a letter to the other defendants' lawyers, attaching a copy of the agreement and informing them that the settlements funds would be allocated as follows: (1) $250,000 to each of the Sanchezes; (2) $1,000,000 to the estate; and (3) $1,000,000 to punitive damages.

At the settlement credit hearing, Tom Hall, one of the Sanchezes' attorneys, testified that the ad litem for Christine, who was a minor, was not present during the settlement negotiations but had verbally approved the amount of the settlement allocated to Christine. Hall testified that Edward had not sought probate court approval of the settlement. Hall stated that the punitive damage award had not been allocated among the estate and the children. Hall was uncertain whether the probate attorney for the estate had approved the allocation. Hall had not discussed the allocation of the funds in dollar figures with the probate attorney or the ad litem but had some general discussion about allocating a portion of the funds to punitive damages. Neither the probate attorney nor the ad litem had given approval of an allocation based on percentages. Hall testified that the allocation to the estate and between actual and punitive damages was decided after consultation with a tax lawyer, giving consideration to estate tax consequences. Hall stated that the estate would be taxable after $675,000; however, the $325,000 would not be taxable if there were deductions from the $1,000,000 allocated to the estate, such as for attorneys' fees. Hall testified that the allocation decision may also have been affected by discussions regarding structured settlement. Hall stated that CPS had voiced a concern regarding the allocation to punitive damages based on whether the punitive damages would be paid from CPS's self-insured retention or insurance proceeds. Hall testified that the final allocation would be made in the final settlement documents, but he was uncertain when those documents would be signed. Hall stated that the Sanchezes would incur income tax liability for the portion of the funds allocated to punitive damages. Hall admitted that the primary benefit of allocating funds to punitive damages was to reduce the settlement credit. Hall also

admitted that it was possible for the plaintiffs to change the allocation before the final settlement documents were signed. The Sanchezes' other attorney, Harry Bates, clarified that the allocation was made after consultation with a tax lawyer and based on the belief of the Sanchezes' attorneys that the punitive damage claim against CPS had merit.

After the evidence was presented, the trial court asked Hall and Bates what actions CPS took that would support punitive damages. After hearing their response, the trial court asked Hall and Bates the basis for allocating four times as much in actual damages to the estate as to the children in view of the fact that Mrs. Sanchez was probably only conscious for 15 seconds. The trial court ruled that the defendants were entitled to the entire $2,500,000 settlement credit.

After the jury rendered its verdict, the trial court held a hearing on post-trial motions. At the hearing, the Sanchezes introduced into evidence the final settlement documents. In the final settlement documents, $1,500,000 in actual damages was allocated to the Sanchezes, $10 in actual damages was allocated to the estate, and $1,000,000 in punitive damages was allocated to the Sanchezes. In response to the introduction of the final documents, the trial court stated, "Mr. Hall stood up and argued CPS wasn't even negligent. How can y'all say they paid 1 million for punitive[s] in light of that?" The trial court also inquired, "Are you—all defendants, satisfied you've made whatever record you want to, to sustain my finding? I don't know if I expressly made that finding, you know, before trial, but I certainly implicitly made it."

A. Findings of Fact and Conclusions of Law

In their reply brief, the Sanchezes contend that they timely requested findings of fact and conclusions of law on the settlement credit issue; therefore, the trial court had a mandatory duty to file findings. Although the trial court had a mandatory duty to file findings, the trial court's failure is not harmful if the record affirmatively shows that the complaining party suffered no injury. *Texas Dept. of Public Safety v. Williams*, 76 S.W.3d 647, 651–52 (Tex.App.-Corpus Christi 2002, no pet.). The test for determining harm is whether under the circumstances, the appellant would have to guess the reason the trial court ruled against it. *Id.; Elizondo v. Gomez*, 957 S.W.2d 862, 865 (Tex.App.-San Antonio 1997, pet. denied). In this case, the trial court's judgment states that its "rulings and rationale for the application of this settlement credit are set forth in the Reporter's Record for the May 25, 2001 hearing on Defendants' Bill of Exception and the hearing of post-trial motions on July 19, 2001." Based on those records, the Sanchezes were not required to guess the reason for the trial court's ruling. The trial court's failure to file written findings of fact and conclusions of law did not result in harm to the Sanchezes.

B. Existence of Allocation

The letter sent by the Sanchezes' attorneys contains an allocation of the settlement funds. An argument can be made that the allocation was not a final allocation because it was subject to change until the final settlement documents were drafted. This argument is bolstered by the evidence that the allocation was changed in the final settlement documents. The focus of the trial court's hearing, however, was on the existence of a sham transaction because the Sanchezes were not required to produce a final allocation until immediately before judgment, and the Sanchezes produced a final allocation before judg-

ment. Therefore, the issue presented in this appeal is whether the trial court properly found that the initial allocation was a sham transaction.

### C. Sham Transaction

■ Mica urges that we apply an abuse of discretion standard of review to the trial court's ruling because the issue involves both factual determinations and legal conclusions. The Texas Supreme Court did not indicate what standard of review should be applied in reviewing the trial court's determination that a settlement allocation is a sham. We agree with Mica that an abuse of discretion standard is appropriate.

■ A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). With respect to the resolution of fact issues, a trial court abuses its discretion only if the trial court could reasonably have reached only one decision, and the trial court reached a different decision. *Id.* at 840. A trial court has no discretion in determining what the law is or applying the law to the facts; therefore, a clear failure of the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

■ Applying an abuse of discretion standard, we must uphold the trial court's decision unless the trial court could only reasonably have decided that no sham transaction existed. The trial court had evidence before it that the two independent checks on the settlement—the ad litem and the probate court—had not approved the allocation. In addition, Hall admitted that the primary benefit to allocating funds as punitive damages was to reduce the settlement credit, and the trial court could have given less weight to Hall's

vague discussion of the tax implications in view of Hall's admission regarding the primary benefit of the allocation. The trial court expressed its concern that the estate initially was being awarded four times as much in actual damages as the children when the evidence showed that Mrs. Sanchez was probably conscious for only 15 seconds. Although this allocation was changed in the final documents, if we consider the evidence and argument presented at the post-verdict hearing, the trial court noted that Hall's argument to the jury that CPS was not even negligent was contrary to a punitive damages allocation. In view of the evidence presented, the trial court did not abuse its discretion because the trial court could reasonably have decided from the evidence that the allocation was a sham. Therefore, the trial court did not err in applying the entire $2,500,000 as a settlement credit for the CPS settlement.

### Loss of Inheritance Damages

The jury awarded the Sanchezes $340,000 for loss of inheritance damages. The trial court reduced the damage award, finding no evidence of loss of inheritance damages in excess of $106,000. The Sanchezes contend that the trial court erred in reducing the jury's award.

### A. Waiver

■ Mica contends that the Sanchezes waived this issue by limiting their appeal to the settlement credit issue. Mica's argument contains a record citation to the Sanchezes' notice of appeal which states the Sanchezes, "appeal from the Judgment signed on August 13, 2001, specifically the portion of the Judgment awarding the non-settling Defendants a dollar-for-dollar credit for the settlement with the settling Defendants." Under the former rules of appellate procedure, an appellant could file a limited notice of appeal; however, that

procedure was abolished under the amended rules. *See* John Hill Cayce, Jr., *Civil Appeals in Texas: Practicing Under the New Rules of Appellate Procedure*, 49 Baylor L.Rev. 867, 890–91 (1997). Because the rules no longer permit a limited notice of appeal, the Sanchezes' notice of appeal specifying one of the issues to be raised should not waive their complaint as to other issues not specifically mentioned.

▮ Mica further contends that the Sanchezes waived this issue by requesting a clerk's record that only included those portions of the record related to the settlement credit issue. The rule and the case cited by Mica do not support its contention. Rule 34.6(c) enables an appellant to request a partial reporter's record under the requirements of the rule, which limits the points or issue to be presented to those points or issues included in the request for the partial reporter's record. Tex.R.App. P. 34.6(a). No similar rule is applicable to the clerk's record because the rule specifies the documents that must be included subject to requests for additional items by the parties. *See* Tex.R.App. P. 34.5(a)(b). Mica's assertion of waiver is overruled.

### B. Concession of Error

Mica also asserts that the Sanchezes' attorneys conceded that the evidence was insufficient to support the $340,000 award at the post-verdict hearing. The Sanchezes respond that the record does not indicate a concession by their attorneys; instead, the record only reflects that the Sanchezes' attorneys did not contest the issue.

When the argument regarding the loss of inheritance damages was raised at the post-verdict hearing, the Sanchezes' attorney stated that the Sanchezes' economist testified regarding Mrs. Sanchez's projected earnings during her work life expectancy of 17.1 years, which he discounted back to present value. The economist also deducted reasonable expenditures. The Sanchezes' attorney claimed that the defendants' argument was that the economist only deducted for Mrs. Sanchez's personal consumption and not the amount she would have expended on the children. The Sanchezes' attorney argued:

MR. BATES: .... So the figure that he did come up with at trial that he testified to that was available to be inherited by Edward and Christine Sanchez was $106,000.

I think they probably do have a legitimate argument that the 340,000 may be excessive. I guess one could argue that those calculations that Mr. Dillman made on her personal expenditures are on the average, that she could have spent more on herself or less on herself; and, therefore, that $106,000 figure could be higher or could be less.

But I think probably the problem that you have with the $340,000 that the jury wrote in, I don't think her total income would have been that much during that time period we're talking about. So I think the Court—

THE COURT: You mean, total, you know, net income, just without paying for food and rent, it wouldn't have been 340?

MR. BATES: Right, that's correct. She earned about $13,000 a year. And if you calculate that out for 17 years and discount it to present value, I think it is less than $340,000. So from that standpoint, I think they probably do have a legitimate argument that it ought to be reduced to $106,000.

I think the argument that there's not enough evidence to support the $106,000 figure, though, is not accurate. I think Mr. Dillman's testimony certainly does support that.

In later discussion regarding the evidence of loss of inheritance, the following dialogue occurred:

THE COURT: And don't I take that out the amount of remittitur? And by the way, let's—is that remittitur, or do I find on the 106 that there's no evidence of damages above 106? Isn't that what you would rather have?

MR. BATES (Counsel for the Sanchezes): I think it's the latter.

THE COURT: Yes, I do too. Don't y'all?

MR. COOPER (Defense counsel): But there's no—

THE COURT: On a remittitur, I say you remit it, or I grant a new trial. I meant, I think there's no evidence—I mean, I think you conceded no evidence above 106. So don't I just disregard the findings beyond—above 106 on inheritance?

MR. BATES: I believe that is what the Court ought to do.

THE COURT: Do the defendants disagree with that?

MR. PRINGLE (Defense counsel): I think you do go by agreement of the parties.

THE COURT: Well, it just wasn't contested. But it's a motion to disregard the answer, the damages on inheritance beyond 106?

MR. PRINGLE: That's right.

THE COURT: So I grant that.

 "[A] party cannot lead a trial court into error and then complain about it later on appeal." *Union City Body Co. v. Ramirez*, 911 S.W.2d 196, 202 (Tex.App.-San Antonio 1995, no writ); *see also Kelly v. Cunningham*, 848 S.W.2d 370, 371 (Tex. App.-Houston [1st Dist.] 1993, no writ). The Sanchezes' attorney, Mr. Bates, told the trial court that the present value of Mrs. Sanchez's income absent any expenditures would be less than $350,000 and that the defendants had a "legitimate" argument that the loss of inheritance damages should be reduced to $106,000. Mr. Bates also told the trial court that the economist testified that the amount available to be inherited was $106,000. In further discussion, the trial court told Mr. Bates that the trial court believed Mr. Bates had conceded that there was no evidence to support a finding above $106,000, and asked Mr. Bates whether the trial court should disregard the findings above $106,000 based on that concession. Mr. Bates responded that he believed "that is what the Court ought to do." Based on this discussion, the Sanchezes acquiesced in the reduction of the loss of inheritance damages and are not be able to complain about the reduction on appeal.

## C. Sufficiency of the Evidence

Even if we address the merits of the Sanchezes' complaint, we believe the record contains no evidence to support the jury's finding regarding loss of inheritance damages in excess of $106,000.

 A trial court may disregard a jury's finding only when there is no evidence to support the jury's finding. *Brown v. Bank of Galveston, Nat. Ass'n*, 963 S.W.2d 511, 513 (Tex.1998); *Komet v. Graves*, 40 S.W.3d 596, 603 (Tex.App.-San Antonio 2001, no pet.). In determining whether there is no evidence to support a jury verdict, we consider the evidence favorable to the jury's verdict and reasonable inferences that tend to support it. *Brown*, 963 S.W.2d at 513; *Komet*, 40 S.W.3d at 603. If there is more than a scintilla of evidence to support the jury's finding, the jury finding must be upheld. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990).

In Texas, loss of inheritance damages are defined as "the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death." *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 633 (Tex.1986). "If the decedent would have earned no more than he and his family would have used for support," "loss of inheritance damages would properly be denied." *Id.*

Dr. Dillman testified that $106,000 represented the present value of Betty Jean Sanchez's stream of income from the date of her death through her work life expectancy, minus what she would have spent on herself. This is the only evidence of the present value that Mrs. Sanchez would have added to her estate and left to her children. Therefore, there is no evidence to support a finding of loss of inheritance damages in excess of $106,000.

Because the Sanchezes led the trial court into disregarding the jury's finding, the Sanchezes did not preserve any complaint regarding loss of inheritance damages for appeal. Even if the complaint was preserved, the trial court did not err in finding no evidence to support loss of inheritance damages in excess of $106,000.

## II. MICA'S CROSS-APPEAL (FOUR ISSUES)

### REFUSAL TO DISQUALIFY JUROR

Mica contends that the trial court erred in refusing to disqualify Juror James Casias for bias. The Sanchezes, Spaw–Glass, and Estrada filed briefs in response to this issue. Estrada adopts the arguments made by the Sanchezes. The Sanchezes and Spaw–Glass contend that the trial court did not err in denying the motion to strike or, alternatively, the error was

harmless in view of the jury's unanimous verdict.

After the jury was sworn but before trial on the merits commenced, Juror James Casias informed the trial court that he worked for a company that had a printing contract with Spaw–Glass and, in his opinion, his service on the jury would present a conflict of interest. Casias informed the trial court that he was providing this information because he felt a little biased on trying to make a decision against Spaw–Glass. Casias stated that the contract with Spaw–Glass did not represent a big part of his paycheck, but it was a contribution. In response to the trial court's inquiry regarding whether Casias honestly thought Spaw–Glass would cancel its contract based on Casias's jury service, Casias responded that he did not know. In response to whether Casias could sit and give a fair decision to both sides based on the evidence, Casias responded that he felt he could probably be a little biased because Spaw–Glass could cancel its contract. Casias stated that if he had some assurance that the contract would not be cancelled, the problem would be solved. The attorney for Spaw–Glass informed Casias that Spaw–Glass had stated that the jury verdict would not affect the contract. The attorney further stated that both sides wanted Casias to decide the case based on the evidence, and if Casias believed Spaw–Glass had responsibility, his obligation was to find Spaw–Glass responsible. The trial court told Casias that it would be inconceivable that a company like Spaw–Glass would change a contract with another company because a jury ruling against it included an employee of the other company. Although the trial court candidly stated that Spaw–Glass's efforts to keep Casias on the jury "almost add credence to what the others are saying," the trial court denied the motion to strike.

A person who has a bias or prejudice in favor of a party is disqualified to serve as a juror. *Buls v. Fuselier,* 55 S.W.3d 204, 209 (Tex.App.-Texarkana 2001, no pet.); *GreenPoint Credit Corp. v. Perez,* 75 S.W.3d 40, 48 (Tex.App.-San Antonio 2002, no pet. h.). Bias is an inclination toward one side of an issue rather than to the other, but to disqualify, it must appear that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality. *Buls,* 55 S.W.3d at 209; *GreenPoint Credit Corp.,* 75 S.W.3d at 48. If a juror's bias or prejudice is established as a matter of law, the trial court must disqualify the juror. *Buls,* 55 S.W.3d at 209. If bias or prejudice is not established as a matter of law, whether the juror is sufficiently biased or prejudiced to merit disqualification is a factual determination to be made by the trial court. *Buls,* 55 S.W.3d at 209; *Sosa v. Cardenas,* 20 S.W.3d 8, 11 (Tex.App.-San Antonio 2000, no pet.). We review the evidence in the light most favorable to the trial court's finding, and we do not reverse on appeal in the absence of an abuse of discretion. *Buls,* 55 S.W.3d at 210; *Sosa,* 20 S.W.3d at 11. The key response that supports a successful challenge for cause is that the juror cannot be fair and impartial because the juror's feelings are so strong in favor of a party that the juror's verdict will be based on those feelings and not the evidence. *Buls,* 55 S.W.3d at 210.

Mica contends that Casias candidly and unequivocally admitted his bias, thereby establishing bias as a matter of law. Alternatively, Mica asserts that the only reasonable inference from Casias's statements is that his state of mind would not permit him to act with impartiality.

We disagree with Mica. First, bias was not established as a matter of law. Casias came forward with a concern that his employment with a company with which Spaw–Glass had a contract might create a conflict of interest. In response to further questioning, Casias acknowledged he had feelings for the plaintiffs but he also felt he "could probably be a little biased." This is not evidence of feelings that are so strong that Casias would base his verdict on his feelings and not on the evidence. Second, the trial court did not abuse its discretion in finding that Casias was not biased. Casias presented a concern regarding a possible conflict of interest. Casias was assured by the trial court and by Spaw–Glass that no conflict of interest existed. After being told that both sides wanted Casias to decide the case honestly based on the evidence, including finding Spaw–Glass responsible if supported by the evidence, Casias stated that the discussion helped him. Mica did not attempt to re-examine Casias to determine whether Casias continued to have a bias after the discussion. Casias never mentioned a possible bias or concern during the voir dire process. In part, the trial court may have assessed the credibility of Casias and determined that Casias might have been motivated by the length of the trial. At the end of the previous day, the impaneled jury was informed that the trial would probably last 3 weeks, and the jury would be working from around 9:00 to 5:30 each day. The trial court also could have disbelieved that Casias was honest about his concern because it was inconceivable to the trial court that Spaw–Glass would cancel its contract.

Viewing this evidence in the light most favorable to the trial court's ruling, we hold that the trial court did not abuse its discretion in denying the motion to strike Casias.

### SUFFICIENCY OF THE EVIDENCE— MICA'S LIABILITY

The jury found Mica was negligent in causing the death of Mrs. Sanchez and

attributed 50% of the negligence to Mica. Mica contends that only impermissible inferences or inference stacking supports the jury's finding. The Sanchezes counter that direct and circumstantial evidence supported a finding that Mica was responsible.

In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the finding, and we disregard all evidence and inferences to the contrary. *Texas Dept. of Mental Health and Mental Retardation v. Rodriguez*, 63 S.W.3d 475, 480 (Tex.App.-San Antonio 2001, pet. denied). If there is a scintilla of evidence to support the finding, the finding will be upheld. *Id.* In reviewing a factual sufficiency point, we are required to weigh all of the evidence in the record. *Id.* Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *Id.*

The pull box in question was located on the northwest corner of the intersection of Pecos and Durango, which also is referred to as the southeast corner of the UTSA project. The three primary conditions of the box that caused it to be dangerous were: (1) the pull box's metal lid was not grounded; (2) the pull box did not have sufficient clearance between the metal lid and the metal conduit inside the box; and (3) the return path to ground was interrupted by CPS's replacement of a portion of the rigid metal conduit with PVC pipe. The primary source of contention is who was responsible for grounding the lid and ensuring proper clearance. The resolution of this issue hinged in part on who installed the pull box and whether subsequent changes were made to the location/elevation of the pull box.

The pull box was originally installed in connection with a lighting project in preparation for further work referred to as the high mast project or Project K. Several witnesses testified that the pull box in question was not the pull box installed during project K. Karl Burkett, an electrical engineer with TxDOT, testified that the pull box as it existed on the day of the incident was not the pull box that had been originally installed based on evidence of: (1) the improper installation; (2) the relocation of the box was necessary for the subsequent road widening; (3) other boxes installed on high mast project were larger; (4) the writing on the pull box lid ("traffic signal") did not meet the plans and specifications of project K that the lid be stamped "illumination" or "electric;" and (5) the manufactured date stamped on the lid proves that the lid was manufactured after the high mast project was completed. E.P. Hamilton, Ph.D., a professional electrical engineer and expert witness called by the Sanchezes, testified that the pull box was not the original box installed on project K based on: (1) project K did not allow Brooks boxes; (2) the box was smaller than the boxes used on project K; and (3) the date code on the lid showed a manufacture date after project K was completed; and (4) the writing on the lid did not meet project K specifications. Hamilton also testified that based on the plans and specifications for the widening of Pecos street, the pull box was required to be moved and lowered.

The evidence indicates that Mica was required to move the pull box during the 1–A project because after Pecos Street was widened the pull box at its current

location would be too close to the curb. Several witnesses testified that when Mica installed the pull box during that project, the lid was required to be grounded, and the box was required to have a 5–9 inch clearance between the lid and the conduit. Others testified that whether the lids required grounding and whether the clearance was required was subject to interpretation. Part of this dispute appears to rest on whether Mica was required to pull the wire through the conduit on project 1–A or on project 1–C. Gerald Zainotz, Mica's electrician on project 1–A, testified that Mica installed the conduit and pull boxes on project 1–A but did not pull the wire until project 1–C. However, L.C. Tubb, Mica's president, admitted that the pull boxes installed on project 1 A were for future traffic signals, indicating Mica knew that wire would be pulled through the pull box when Mica installed it. One witness, Harry H. Levy IV, a master electrician employed y Mica during projects 1–A and 1–C, testified that the plans contained a gap because the plans for project 1–C did not require grounding of pull boxes installed on project 1–A. Levy agreed that when wire was pulled through conduits, the lid should be grounded, but testified that the contract did not require grounding. Several witnesses testified that Mica was responsible for installing the pull box, relying in part on the presence of black base covering a kink in the conduit and against the pull box that would only have been installed by Mica during the widening of Pecos. Robert Witter, an electrical engineer, testified that Mica installed the pull box at its current location based on the date code on the lid, the difference in the boxes used on project K, the absence of gravel under the box to stabilize, and the kink in the conduit. E.P. Hamilton, Ph.D., the Sanchezes' expert electrical engineer, testified that based on the plans and specifications for the widening of Pecos street,

the pull box was required to be moved and lowered. Hamilton also testified that other boxes installed in relation to project 1–A were identical to the pull box in question and also were not grounded. Hamilton agreed that the plans for project 1–A did not specify moving the box; however, Hamilton stated that the box was required to be moved out of necessity. Hamilton further stated that because the movement of the pull box was not in the plans, TxDOT likely did not inspect the work used in moving the pull box.

The final project—the UTSA project—required the excavation and replacement of the sidewalk surrounding the UTSA campus. Mica's contention is that the contractor, Spaw–Glass, and subcontractor, M & M, on the UTSA project replaced the pull box in question. Employees for both Spaw–Glass and M & M testified that they did not replace the box and used only hand excavation around the pull box. A separate contention was that Spaw–Glass and M & M did not replace the pull box, but their actions caused the pull box to be further lowered decreasing the clearance inside the pull box. The lowering of the pull box during the UTSA project was supported by survey data showing that the pull box had been lowered and witness testimony regarding those surveys. Several witnesses explained that the discrepancy in the surveys was not caused by M & M's actions but by surveying errors, soil shrinkage, differences in surveying equipment and the difference in necessary accuracy between the two surveys.

▮ Mica contends that the jury was required to make all of the following inferences from the evidence: (1) the pull box was moved as part of project 1–A; (2) Mica moved the pull box as part of project 1–A; (3) after being moved, the pull box had insufficient clearance; and (4) no change after Mica moved the pull box.

The evidence regarding the movement of the pull box as part of project 1–A is summarized above. The evidence showed that the widening of Pecos Street necessitated the movement, and Mica's president, L.C. Tubb, admitted that if the pull box was moved during project 1–A, Mica moved it. Evidence was presented that other pull boxes installed by Mica had the same deficiency as the pull box in question, and even if the pull box had met the clearance requirement at the time of the installation, it still was not grounded. Although Mica contends that we have to infer no change, Mica's failure to ground the box alone is sufficient to support the jury's negligence finding. Several witnesses agreed that if the box had been grounded, the clearance level would not have made a difference.

Having reviewed all of the evidence, we hold that the evidence is sufficient to support the jury's negligence finding with regard to Mica.

## JURY CHARGE

Mica contends that the trial court erred in refusing to submit a jury question with regard to statute of repose and in refusing to instruct the jury regarding new and independent cause.

 The standard of review for charge error is whether the trial court abused its discretion. *Texas Dept. of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex.App.-El Paso 2000, no pet.). Our review requires that we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *De Leon*, 31 S.W.3d at 300. A trial judge must submit a requested jury question if it is supported by some evidence, but may refuse to do so if it is not supported by any evidence. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.

1992); *James v. Kloos*, 75 S.W.3d 153, 162 (Tex.App.-Fort Worth 2002, no pet.). We may not reverse for jury charge error unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment. *De Leon*, 31 S.W.3d at 300.

 Whether a charge submits the controlling issues in a case, in terms of theories of recovery or defense, is a question of law that we review de novo. *Id.; Fuller–Austin Insulation Co. v. Bilder*, 960 S.W.2d 914, 917 (Tex.App.-Beaumont 1998, pet. dism'd).

### A. Statute of Repose

 The statute of repose bars any claim against a person who constructs improvements to real property that is asserted more than ten years after the substantial completion of the improvement. TEX. CIV. PRAC. & REM.CODE ANN. § 16.009(a) (Vernon 1986). A statute of repose differs from a traditional statute of limitations. *Dallas Market Center Dev. Co. v. Beran & Shelmire*, 824 S.W.2d 218, 221 (Tex.App.-Dallas 1991, writ denied). A traditional statute of limitations runs from the time that a cause of action accrues, which is when the injured party discovers or reasonably should have discovered a defect or injury. *Id.; see also Gordon v. Western Steel Co.*, 950 S.W.2d 743, 746 (Tex.App.-Corpus Christi 1997, writ denied). With a statute of repose, the time period begins running when the improvement is substantially completed rather than when a cause of action accrues. *Gordon*, 950 S.W.2d at 746; *Dallas Market Center Dev. Co.*, 824 S.W.2d at 221. As a result, a statute of repose can cut off a right of action before an injured party discovers or reasonably should have discovered the defect or inju-

ry. *Dallas Market Center Dev. Co.*, 824 S.W.2d at 221.

In *Gordon*, the Corpus Christi court considered whether a subcontractor can be considered to have substantially completed its share of a construction project for purposes of commencing the statute of repose when the entire construction project is not completed. 950 S.W.2d at 746. The Corpus Christi court held that where different subcontractors are responsible for the construction of different parts of a larger project, the statute of repose should be applied to each of those individual subcontractors when they have completed their respective improvements. *Id.* at 748. The court noted "it is not overly burdensome to decipher when respective contractors substantially complete their improvements (e.g. when they submit their final bills and/or walk away from the project)." *Id.* at 749. The court concluded, "If a material issue arises as to whether the date they completed their work falls outside the period of repose, then ... the trier of fact should resolve such issue." *Id.*

■■■ Mica relies on testimony by two witnesses that work on the Pecos Street part of project 1–A was completed more than ten years before the lawsuit was filed to support its contention that a fact issue was raised regarding the date on which the statute of repose began running. Mica asserts that the improvement for purposes of the statute of repose is the work Mica performed on Pecos Street, not the completion of all of Mica's work on project 1–A. *Gordon* does not support this contention. Based on the language in *Gordon*, the statute of repose with regard to project 1–A commenced when all of Mica's work on project 1–A was completed, not simply a part of the work on that project. All of the testimony relating to the completion of all of Mica's work on project 1–A had an ending date that was within ten years from the date the lawsuit was filed. Accordingly, we hold as a matter of law that substantial completion of the improvement required Mica to complete all of its work on project 1–A for purposes of the statute of repose, not just an isolated part of that project. It would be overly burdensome to decipher when individual portions of a subcontractor's overall project are completed for purposes of the statute of repose. Because no evidence was presented that Mica completed its work on project 1–A more than ten years before the lawsuit was filed, Mica was not entitled to a jury question on statute of repose.

## B. New and Independent Cause

■■■ "Texas courts distinguish between a new and independent cause and a concurrent act." *Benitz v. Gould Group*, 27 S.W.3d 109, 116 (Tex.App.-San Antonio 2000, no pet.). "A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor." *Id.* "A 'new and independent cause' sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury." *Id.* "The doctrine of 'new and independent cause' is not an affirmative defense; it is one element to be considered by a fact finder in determining whether proximate cause exists." *Id.* "The new and independent cause must be one incapable of being foreseen by the original wrongdoer in the exercise of ordinary care." *Id.* The following criteria are applied to determine if an act is a concurring or a new and independent cause:

a. the fact that its intervention brings about harm different in kind from

that which would otherwise have resulted from the actor's negligence;

b. the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operations;

c. the fact that the intervening force is operating independently of any situation created by the actor's negligence or, on the other hand, is or is not a normal result of such a situation;

d. the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

e. the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

f. the degree of culpability of a wrongful intervening force in motion.

*Id.* at 117.

■ As proof of a new and independent cause, Mica seeks to rely on the evidence that CPS replaced a portion of the rigid metal conduit which was intended to serve as the return path to ground with PVC pipe. However, the evidence clearly established that the return path to ground could never have worked as it was intended even if CPS had not replaced the conduit because Mica did not ground the lid. Accordingly, the trial court did not abuse its discretion in denying Mica's request for an instruction on new and independent cause.

### EXCESSIVE DAMAGES

Mica contends that the damages awarded to the Sanchezes for loss of companionship and society and mental anguish, past and future, and the damages awarded to Estrada for past physical pain and mental anguish are excessive. The jury awarded the Sanchezes $5,000,000 for loss of companionship and society and mental anguish sustained in the past and $2,000,000 for loss of companionship and society and mental anguish sustained in the future. The jury awarded Estrada $300,000 for physical pain and mental anguish in the past. No question was submitted with regard to Estrada's future physical pain and mental anguish.

■ We review an excessive damages complaint by considering the factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998). When considering a factual sufficiency challenge to a jury's verdict, we consider and weigh all of the evidence, not just that evidence supporting the verdict. *Id.* at 406–07. The jury's verdict can be set aside only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407. Because we are not the fact finder, we may not pass upon a witness's credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id.*

■ Mental anguish damages must be supported by direct evidence of the nature, duration, or severity of the plaintiffs' anguish, thus establishing a substantial disruption in the plaintiffs' daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996). In addition to evidence of compensable mental anguish, evidence must also be presented to justify the amount awarded. *Id.* Juries must find an amount that fairly and reasonably compensates for the loss. *Id.*

### A. The Sanchezes

Injuries to the familial relationship are significant injuries worthy of compensation. *Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex.1983). Mental anguish compensates a child for the emotional response to a parent's death. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex.1986). Loss of society or companionship constitutes a loss of the positive benefits flowing from the love, comfort, companionship, and society that the children would have received had the negligence not occurred and had their mother not died. *Id.* at 687–88; *see also Enochs v. Brown*, 872 S.W.2d 312, 321 (Tex.App.-Austin 1994, no writ). Mental anguish is not concerned with the benefits the children have lost, but with the issue of compensating them "for their harrowing experience resulting from the death of a loved one." *Moore*, 722 S.W.2d at 688.

Loss of society asks, "what positive benefits have been taken away from the beneficiaries by reason of the wrongful death?" *Id.* "Mental anguish damages ask about the negative side." *Id.* In other words, "what deleterious effect has the death, as such, had upon the [children]?" *Id.*

JoAnn Murphy, Ph.D., the clinical psychologist who treated the Sanchezes, saw Edward and Christine every other week immediately after Mrs. Sanchez's death. The sessions then continued monthly until they ended. Murphy estimated that she had approximately 20–25 total sessions with the children. The sessions primarily consisted of Murphy talking with the children about the loss of their mother.

Murphy testified that Mrs. Sanchez reared the children to achieve success, to be honest, and to have integrity. Murphy testified that Edward had a speech impediment and learning challenges. Mrs. Sanchez was able to teach Edward to overcome these difficulties by instilling in him a high level of motivation and a high desire to achieve through perseverance. Edward had a close bond with his mother and considered her an ideal person. Mrs. Sanchez taught her children high morals and ideals. Each child had assumed a parenting role over the other since Mrs. Sanchez's death if one believed the other was not meeting the standards their mother had taught them. The bond between Edward and Mrs. Sanchez was evidenced by Edward assuming the role of Mrs. Sanchez's protector against his father, who Edward believed treated Mrs. Sanchez poorly. The children's father was not around significantly at any time during their upbringing, making the loss of Mrs. Sanchez more significant due to the absence of another parent. Murphy stated that Mrs. Sanchez's death is a very emotional topic for Edward even today and will have an impact on his life for a long time and probably forever. The loss of his mother may cause Edward to have problems in male-female relationships because it will be difficult for any woman to live up the standards of his mother, as Edward sees them.

Christine did not have the learning challenges Edward had experienced, and her feelings were not as intense as Edward's. However, Murphy believed that Christine's grief would be prolonged by her shyness. Christine was more private and isolated; however, Murphy stated that she had seen a video of Christine with Mrs. Sanchez, and Christine was a completely different person with her mother. Christine viewed her mother as hardworking, honest, as having struggled for everything she had obtained in life, and as someone who was there for her. Christine was determined to graduate from college.

Murphy stated that Mrs. Sanchez's death was a life-altering event for both

children. Murphy testified that the family had struggled economically due to the absence of the children's father. Murphy believed that the children were seeing someone else for treatment but was uncertain whether the treatment had ended.

Edward was a senior in high school when his mother died. At the time of trial, Edward had been enrolled at San Antonio College for a year or two years and planned to obtain a degree in photography. Edward testified that his mother meant the world to him and without her he probably would not have graduated high school or reached the other goals he had. Edward testified that his mother put "effort" into him. Edward stated that his mother encouraged him to pursue his dreams. Edward testified that his mother went to school to eat with him and helped him with his problems. Edward testified that his mother wanted him to marry and have children because Mrs. Sanchez wanted to be a grandmother. Edward made a video on the first anniversary of Mrs. Sanchez's death showing the family. Edward testified that his mother sacrificed her life to get them where they were. Edward's video was shown to the jury.

Christine testified that she was fourteen when her mother died. She planned to graduate high school in 2003 and then attend college and become a teacher. Christine testified that her mother was hardworking and sacrificed to purchase Christine a middle school ring. Christine stated that her mother would surprise her at school and have lunch with her. Christine testified that her mother volunteered them to work at the Jimenez Thanksgiving dinner, and she and Edward had continued volunteering for that dinner since their mother died. Christine recalled when she and her mother would sit together in bed, and her mother would tell her stories about when she was young which Christine

missed a lot. From the record, it appears that Christine's attorney stopped questioning her because she was becoming emotional.

 The damages awarded for loss of companionship and society and mental anguish, while large, are reasonable compensation for two children who have lost their only care-taking parent. The evidence is sufficient to support the damages awarded to the Sanchezes for loss of companionship and society and mental anguish.

## B. Estrada

Estrada was electrocuted when she attempted to assist Mrs. Sanchez. Estrada thought Mrs. Sanchez had fainted or fell. Estrada was present when EMS arrived and turned Mrs. Sanchez over. Mrs. Sanchez had been foaming at the mouth and had saliva all over her face and hair. Estrada testified that EMS opened Mrs. Sanchez's eye, shined a flashlight in it, and pronounced her dead.

Estrada went to work but could not stop crying and shaking, so her supervisor sent her home. Someone drove Estrada home because she could not drive in her condition. The next day, Estrada was taken to the hospital after she reported for work. Estrada testified that her head and stomach hurt her, and she fainted one time at work. Estrada was seen by Dr. Jimenez for depression, and Dr. Jimenez referred her to Dr. Silva, a neurologist, for her headaches. Estrada was prescribed medication and physical therapy. Estrada testified that she blamed herself for Mrs. Sanchez's death for a long time because she could have stopped her so they could walk together that day. Estrada testified that it would have been better if she had been the one electrocuted because her children were grown. By the time of trial, Estrada was no longer seeing any physicians for treatment.

Dr. Silva testified that Estrada's injuries were caused by the electrocution. Although Dr. Silva agreed that some of the injuries he diagnosed were caused by aging, Dr. Silva stated that the severe headaches were not a product of age. Dr. Silva testified that the EEG showed abnormalities in Estrada's brain that were not a normal part of the aging process.

Estrada testified regarding her physical pain. Estrada's physical pain and mental anguish are also documented in the treatment she received, and Estrada's medical records were introduced into evidence.

This evidence is sufficient to support the jury's damage award to Estrada for physical pain and mental anguish in the past.

CONCLUSION

The trial court's judgment is affirmed.