TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RE-TARDATION, Appellant,

v.

Diana RODRIGUEZ, Appellee.

No. 04–99–00603–CV.

Court of Appeals of Texas, San Antonio.

Oct. 31, 2001.

tween the ages of fifteen and seventeen only if the juvenile court waives jurisdiction, properly certifies its action, and transfers the case to the district court. *See In re N.J.A.,* 997 S.W.2d 554, 555 (Tex.1999); *see also Ex parte Trahan,* 591 S.W.2d 837, 841 (Tex.Crim.App. 1979) (holding that such waiver and transfer are essential to the district court's jurisdiction); *Whytus v. State,* 624 S.W.2d 290, 291 (Tex.App.—Dallas 1981, no pet.) (same). Indeed, the juvenile court retains exclusive jurisdiction over a juvenile regarding an offense committed between the ages of fourteen and seventeen, even though its jurisdiction then is limited to dismissing or transferring the case if all criteria are satisfied. TEX. FAM.CODE ANN. § 54.02(j) (Vernon 1996 & Supp.2001); *In re N.J.A.,* 997 S.W.2d at 556.

Robert B. O'Keefe, Asst. Atty. Gen., Austin, for appellant.

Bruce J. Mery, Law Office of Bruce J. Mery, San Antonio, Karl E. Hays, Law Office of Edwin J. (Ted) Terry, Jr., Austin, for appellee.

Sitting: HARDBERGER, Chief Justice, DUNCAN, Justice (concurring in the judgment only), and ANGELINI, Justice.

ANGELINI, Justice.

The Texas Department of Mental Health and Mental Retardation of the State of Texas ("MHMR") appeals a judgment awarding damages to Diana Rodriguez ("Rodriguez") in a whistle blower action. MHMR asserts six points of error, contending that the evidence is legally and factually insufficient to support several of the jury's findings, and that the trial court erred in failing to apply the statutory damages cap to damages for past mental anguish and to the award of pre-judgment interest.

### BACKGROUND

Rodriguez was hired as a case worker at the Laredo State Center ("LSC"), a program operated under MHMR supervision. Shortly thereafter, Rodriguez returned to school and obtained a masters degree in counseling psychology. She then returned to LSC in 1991 as an associate psychologist.

In 1995, Rodriguez was named as program administrator of LSC's Crisis Intervention Unit ("CIU"). During this time, Rodriguez was appointed to a Mental Health Task Force, consisting of health care and political representatives. Some of the task force members, including Rodriguez, went to Starr County in April 1996 to educate officials regarding civil commitment procedures. Upon their return, Rodriguez and two other LSC employees reported their findings to LSC administrators, including Javier Ramirez, LSC's chief executive. The report noted that Starr County officials did not have a clear understanding of the Mental Health Code and possibly were abusing the civil commitment process.

Ramirez responded to the report in writing, complimenting the employees on their efforts and requesting that more specific proposed solutions be developed. Ramirez

noted that any allegations regarding civil rights violations would be taken seriously. Despite the continued efforts of LSC employees, however, Starr County officials apparently made no changes in their civil commitment procedures.

In September of 1996, Rodriguez and Dr. Jose G. Garcia, LSC's consultant psychiatrist, again went to Starr County to provide technical assistance in commitment procedures. At Ramirez's request, they prepared a memorandum reporting that the county attorney's office was resisting any modification in procedures to properly handle the legal requirements for involuntary commitment. The report stated that the due process of proposed patients is rarely protected. The report strongly recommended intensive training on mental health issues for all staff handling intake evaluation in Starr County. The report concluded that the concerns had been discussed with Barbara Owens from the office of legal counsel of MHMR in Austin, who indicated she would address the issue from the state level. Rodriguez testified that she distributed the memorandum to Ramirez and several others at LSC around 10:00 a.m. on September 26, 1996.

Approximately one month earlier, Ramirez had issued a memorandum to all staff in which he noted that some staff might not be pulling their weight or complying with their tasks as defined in their job descriptions. In keeping with his management style, Ramirez stated that the memo was to serve as official notice that failure to comply with a job description, violation of departmental rules and regulations, commission of insubordination or acts of consumer abuse/neglect, or failure to provide services to consumers would not be tolerated.

Also, during September 1996, Ramirez implemented a mandatory staff training program. Rodriguez attended the training on September 24, 1996, but failed to show up for training on September 25. Shortly after the training session commenced, the staff development director went to Rodriguez's office and inquired about her absence from the training session. At the time, Rodriguez was in a meeting with a representative from the Texas Department of Protective and Regulatory Services ("TPRS"). Ramirez testified that if a TPRS investigator is present at LSC conducting an investigation, Rodriguez is required by law to cooperate with him. Nevertheless, Sanchez insisted that Rodriguez attend the training. Sanchez testified that Rodriguez refused.

Sanchez reported Rodriguez's failure to attend the training to Ramirez. Ramirez went to Rodriguez's office, directed her to attend and instructed a human resources employee to escort Rodriguez to the training. Rodriguez testified that another employee, a department manager, was also absent from the training; however, Ramirez testified that department managers were not required to attend. Rodriguez went to the training after she finished her report for the TPRS.

On September 26, 1996, Ramirez prepared a Thurston letter, which is the first step in LSC's disciplinary process, regarding the incident. Ramirez testified that when he prepared the Thurston letter, he intended to terminate Rodriguez. He further testified that he had not seen Rodriguez's September 26, 1996 report regarding Starr County when he prepared the Thurston letter. Rodriguez received the Thurston letter on September 27, 1996 at 4:00 p.m. Rodriguez testified that personnel policies required that her immediate supervisor, not Ramirez, prepare the Thurston letter. Ramirez, however, testified that he had prepared the Thurston letter himself because he was directly involved in the confrontation.

On September 28, 1996, Rodriguez filed a rebuttal to the Thurston letter, stating that she had not been notified that attendance on September 25, 1996, was mandatory. She subsequently filed an official complaint against Ramirez, with Ramirez's supervisor, Sam Wilson. Wilson determined that the Thurston letter should be removed from Rodriguez's file; however, the letter was not removed until January 9, 1997, after Rodriguez filed her lawsuit.

On October 14, 1996, Lillian Dickinson, Rodriguez's immediate supervisor, wrote a memorandum to Ramirez regarding an incident involving the CIU dispensing medication to an outpatient. Rodriguez had informed Dickinson that dispensing medication to an outpatient violated the Code. Dickinson reported Rodriguez for questioning her authority. Dickinson noted that Rodriguez was written up because of her attitude and behavior, and not because she was wrong with regard to what the Code required.

Two days later, on October 16, Rodriguez was given a performance counseling and review. At the meeting, Ramirez read Rodriguez's job description and instructed her to complete a number of assignments and to report directly to Dickinson about important issues. Rodriguez testified that she was not demoted nor were her wages affected by the performance counseling. Further, the performance counseling did not cause any change or loss in job duties or responsibilities.

In November of 1996, Rodriguez received a performance evaluation. Although her overall evaluation was "meets standards," Rodriguez received a "below standards" evaluation for "comply[ing] with applicable Center, TXMHMR, and unit rules, policies and procedures for the Laredo State Center 100% of the time." Dickinson testified that the "below standards" rating had to do with following unit rules, policies, and procedures, including the Code. Specifically, Rodriguez had not attended the mandatory training and had behaved in an insubordinate manner to Dickinson. Rodriguez testified that she believed the "below standards" evaluation precluded her from receiving a raise; however, her testimony was rebutted by several LSC managers, who testified that one "below standards" rating in a single category would not preclude Rodriguez from receiving a raise.

On December 6, 1996, Rodriguez filed suit, alleging that she had been subjected to adverse personnel actions as a result of reporting violations of the law in Starr County.

Late in 1997, Rodriguez became concerned that patients were not receiving appropriate treatment in the CIU. Rodriguez began collecting documentation which she gave to Dickinson. A technical assistance team was sent to investigate and, as a result of the investigation, the team recommended that the CIU switch to a nurse manager model of management. MHMR followed this recommendation.

Because this change in management style required a nurse to manage the unit, Rodriguez was transferred to Club Primavera, a rehabilitation program that was considerably smaller than CIU. When she was transferred, Rodriguez was given one hour to vacate her office and, according to Rodriguez, four people watched as she cleared her office.

Rodriguez filed a formal complaint regarding the transfer, expressing concern that Club Primavera was soon to be shut down. Ramirez responded that, although he had considered closing Club Primavera at one point, he eventually had decided to maintain the program. Although there was evidence that working in the CIU was considered more prestigious than working

in the rehabilitation program, Rodriguez admitted that the transfer offered her a new challenge and an opportunity to restructure and reorganize. Rodriguez stated that she enjoyed working in the program and admitted that the transfer did not involve a change in her title or salary. There was testimony from Rodriguez's coworkers that she was professional and competent, but that after the September Starr County report, the attitude at LSC toward Rodriguez became hostile.

Rodriguez testified that she generally received a 3% raise if she was ranked as "exceeding standards" on her performance evaluation. However, Rodriguez, since 1996, has not received any raises. Rodriguez did receive a promotion in January of 1996 from Program Administrator I to Program Administrator II. And, in the fall of 1997, Rodriguez received the $100 across the board raise given to each employee of the facility.

Yvonne Lopez, who was special assistant and assistant director for support services of LSC, testified that because Rodriguez was promoted from Program Administrator I to Program Administrator II in January of 1996, she was precluded by MHMR policies from receiving a merit increase within the following 12 month period. Lopez further testified that she participated in the decision to transfer Rodriguez to the rehabilitation program. The decision to transfer was based on the CIU's conversion to a nurse manager model and the existence of a vacancy at Club Primavera for which Rodriguez was qualified. Lopez stated that Rodriguez's report regarding the violations in Starr County did not factor into the transfer decision.

## DISCUSSION

### A. *Legal and Factual Sufficiency*

■ MHMR's first four points of error challenge the legal and factual suffi-

ciency of the evidence to support various jury findings. In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the finding, and we disregard all evidence and inferences to the contrary. *See Vickery v. Vickery,* 999 S.W.2d 342, 375–76 (Tex. 1999). If there is a scintilla of evidence to support the finding, the finding will be upheld. *See id.* In reviewing a factual sufficiency point, we are required to weigh all of the evidence in the record. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See id.* The jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Knox v. Taylor,* 992 S.W.2d 40, 50 (Tex.App.— Houston [14th Dist.] 1999, no pet.). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998).

### 1. *Adverse Personnel Action and Causation*

■ In its first issue, MHMR challenges the legal and factual sufficiency of the evidence to support the jury's finding that Rodriguez suffered adverse personnel actions that would not have occurred absent her reporting of Starr County's legal violations. The three adverse personnel actions Rodriguez contends were taken against her are: (1) the Thurston letter; (2) the "below standards" performance evaluation ranking; and (3) her transfer from CIU to the rehabilitation program. Section 554.001(3) of the Texas Government Code defines "personnel action" as an action that affects a public employee's

compensation, promotion, demotion, transfer, work assignment, or performance evaluation. *See* TEX .GOV'T CODE ANN. § 554.001(3) (Vernon Supp.2000). MHMR asserts, however, that we must interpret the meaning of "adverse personnel action" in view of the federal court cases holding that only "ultimate employment decisions" are prohibited, which do not include reprimands, warnings, and missed pay increases which lack significant consequence. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 709 (5th Cir.1997). We disagree with MHMR's narrow reading of the term "personnel action."

The statutory definition specifically includes actions affecting transfer, work assignment, or performance evaluation, not just ultimate employment decisions. And, although there appears to be little in the way of actual adverse consequences to Rodriguez as a result of the three actions of which she complains, there is evidence from which the jury could conclude that they had an adverse impact on Rodriguez. The Thurston letter was a step toward taking disciplinary action, the "below standard" evaluation was an unfavorable reflection of her performance, and some witnesses perceived the rehabilitation unit to which Rodriguez was transferred to be a less desirable place to work.

■ MHMR also challenges the causation aspect of Rodriguez's claim.[1] The Texas Supreme Court has recently clarified the causation standard that was first announced in *Texas Dep't of Human Serv. v. Hinds*, 904 S.W.2d 629 (Tex.1995). *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex.2000). To show causation,

Rodriguez must demonstrate that after she reported the violation, she suffered discriminatory conduct that would not have occurred when it did if she had not reported the illegal conduct. *See id.* Causation may not be inferred without some evidence to support the finding. *See id.* Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. *Id.* Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.* Evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. *Id.*

(A) The Thurston Letter

■ On September 25, Rodriguez did not attend a mandatory training session until she was reminded to attend by the staff development director, directed to attend by Ramirez, and then, eventually, escorted by a human resources employee. According to Rodriguez, she distributed the memorandum regarding the commitment procedures in Starr County the following day, on September 26, at about 10:00 a.m. Also, on September 26, Ramirez prepared the Thurston letter regarding the training incident as a disciplinary pro-

---

**1.** Section 554.004 of the Texas Government Code states that causation is presumed if the adverse personnel action occurs not later than the 90th day after the date the employee reports the violation. *See* TEX.GOV'T CODE ANN. § 554.004(a) (Vernon Supp.2000). The presumption is subject to rebuttal. *See id.* Once MHMR offered sufficient evidence to suggest

no connection between Rodriguez's report and the adverse personnel actions, the presumption was rebutted and Rodriguez was required to prove a causal connection. *See Texas Natural Resource Conservation Com'n v. McDill*, 914 S.W.2d 718, 724 (Tex.App.—Austin 1996, no writ).

cedure against Rodriguez. Rodriguez received it on September 27, at 4:00 p.m. Although the timing of events is such that Ramirez might have seen the report before preparing the Thurston letter, Ramirez testified that when he prepared the Thurston letter, he had not seen Rodriguez's September 26 report. Thus, there is no evidence that Ramirez saw Rodriguez's report before he issued the Thurston letter.

Likewise, there is no evidence that Ramirez expressed a negative attitude toward Rodriguez's report concerning Starr County procedures. In fact, Ramirez had complimented Rodriguez and others for their efforts in preparing a similar report and had indicated he would give serious consideration to civil rights violations in Starr County.

With regard to adherence to established policy, Rodriguez testified that established policy required her immediate supervisor, Dickinson, to have prepared the Thurston letter instead of Ramirez. However, Ramirez explained that he prepared it himself because he was directly involved in the confrontation with Rodriguez. Furthermore, Dickinson had only been Rodriguez's supervisor for a short period of time.

Rodriguez attempted to show she was treated in a discriminatory manner in comparison to similarly situated employees by testifying that another supervisor who did not attend the training session was not disciplined; however, Ramirez explained that the other supervisor was a department head and, therefore, was not required to attend.

Although Rodriguez apparently did not initially receive notice of the training session, she was directed to attend after it began. However, she, at first, refused because she was in a meeting with a TPRS investigator and only went to the training session after finishing her report for the investigator and receiving an escort from the human resources department. Although it was eventually determined that the Thurston letter should be removed from Rodriguez's file, this does not show that Ramirez's stated reason for preparing the letter was false or that the Starr County report was the actual reason for the Thurston letter.

(B) The October 16, 1996 Performance Evaluation

Although Rodriguez received an overall "meets standards" evaluation, she received one "below standards" ranking. It is undisputed that Ramirez had knowledge of Rodriguez's Starr County report by the time she received her October 16th performance review. However, as stated above, there is no evidence that Ramirez ever reacted negatively toward the report and, in fact, had reacted favorably to Rodriguez's work in Starr County.

Further, there is no evidence that in giving Rodriguez one "below standards" ranking, established policies were not followed or that she was treated differently from similarly situated employees. And, according to Dickinson, the "below standards" rating concerned unit rules, policies, and procedures. Specifically, she referred to Rodriguez's failure to attend the training session and her insubordination on other matters. Furthermore, there is no evidence that these stated reasons were false.

(C) Transfer to the Rehabilitation Program

Again, it is undisputed Ramirez knew of the Starr County report when Rodriguez was transferred to the rehabilitation program. But, although the process by which she was transferred was unusual, there is no evidence the decision to transfer was made without adhering to established policy. In fact, it is undisputed that when the CIU converted to a nurse manager model, it was no longer feasible to keep Rodriguez as program manager.

Further, there is no evidence Rodriguez was treated differently from similarly situated employees or that the stated reasons for transferring her to another unit were false. Rodriguez reported problems in the unit, so a team was called in to address the problems. After conducting a study, the team recommended a change to a nurse manager model. This necessarily required a nurse to manage the unit. Rodriguez was transferred to the rehabilitation unit with no reduction in pay.

In summary, Rodriguez complains of only three adverse employment actions taken against her. With regard to the Thurston letter, there is no evidence that Ramirez was aware of Rodriguez's report when he issued it and, moreover, it related to his perception at the time he issued it that Rodriguez had refused to attend mandatory training. With regard to the performance evaluation and the transfer to the rehabilitation unit, Ramirez was clearly aware of Rodriguez's report regarding Starr County; however, the evidence shows he never reacted negatively to the report and, in fact, had reacted favorably to Rodriguez's efforts in Starr County. Furthermore, established policy was generally followed except for minor deviations, which were explained. And, there is no evidence Rodriguez was treated any differently from similarly situated employees or that the stated reasons for taking the actions were false. Thus, the types of circumstantial evidence set forth by the Supreme Court in *Zimlich* simply are not existent in this case. The evidence is legally insufficient to show that the three adverse employments actions of which Rodriguez complains would not have been taken if Rodriguez had not made her Starr County Report. As stated in *Zimlich*, there is no evidence "from which a fact finder could reasonably infer that discrimination was a factor in the decision process." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex.2000). Without evidence supporting such an inference, "a finding of liability rests only on speculation." *Id.* at 70.

Because we find there is no evidence of causation to support the jury's finding, we need not address Rodriguez's remaining issues.

CONCLUSION

We hold there is no evidence of causation to support the jury's finding. We, therefore, reverse and render judgment in MHMR's favor.

Concurring Opinion by Tom Rickhoff, Justice.

Dissenting opinion by PHIL HARDBERGER, Chief Justice (joined by Justice López and Justice Stone).

RICKHOFF, Justice, concurring.

In my opinion, the adverse employment action must be taken bases on the contents of the "whistle–blower" report. In this case, none of the appellee's superiors were critical of the content of her report; her supervisors agreed that Starr County officials were abusing the requisite legal procedures in the methods they were using for mental health commitments. The adverse employment action was related to the manner in which the appellee acted subsequent to the report that caused her to be viewed as an uncompromising non–team player. The appellee was forceful, difficult, and opinionated at a time when a new supervisor had a yen for team players. The adverse employment action is not linked to her criticism of Starr County but with her attitude in the workplace. Because the majority reaches the same result, I concur.

HARDBERGER, Chief Justice, dissents.

To prove causation, Rodriguez was required to demonstrate that after she re-

ported Starr County's violations of the Mental Health Code, she suffered adverse personnel actions that would not have occurred when they did if she had not reported the illegal conduct. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000). I agree with the majority that the Thurston letter and the performance evaluation were adverse personnel actions. However, I disagree that there was no evidence to support the jury's finding that Rodriguez suffered these adverse personnel actions because she reported the illegal conduct.

Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. *Id.* Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.*

### (1) *Knowledge of the Report*

The majority concedes that "the timing of the events is such that Ramirez might have seen [Rodriguez's] report before preparing the Thurston letter." However, the majority rejects this possible inference because Ramirez testified that he did not see the report before he prepared the Thurston letter. In doing so, the majority ignores the applicable standard of review.

When considering a legal sufficiency complaint, we consider only the evidence and inferences that tend to support the jury's finding, disregarding all evidence and inferences to the contrary. *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). "The court of appeals is not a fact finder. Accordingly, the court of appeals

may not pass upon the witnesses' credibility or substitute its judgment for that of the jury." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998).

The jury could have disbelieved Ramirez's testimony that he had not seen the report when he prepared the Thurston letter. In any event, our standard of review requires us to disregard Ramirez's testimony because it is contrary to the jury's finding. Considering only the evidence and inferences that tend to support the jury's finding, as we are required to do, the jury could have inferred from the timing of the events that Ramirez had seen the report before preparing the Thurston letter. The evidence is undisputed that Ramirez had knowledge of the report before the performance evaluation.

### (2) *Expression of a Negative Attitude Toward the Employee's Report*

Although Ramirez had praised a previous report by Rodriguez and others regarding the Starr County violations, that report did not circulate to staff outside the LSC. During the performance evaluation, Ramirez instructed Rodriguez that she was to report directly to her immediate supervisor, Dickinson. Ramirez rejected Rodriguez's reply that she was precluded from reporting to Dickinson regarding certain matters, instructing Rodriguez that her unit was not an island. From this evidence, the jury could infer that Ramirez had a negative attitude toward Rodriguez's report because she sent it to supervisors outside the LSC.

### (3) *Failure to Adhere to Established Company Policies Regarding Employment Decisions*

Under the established policies, Rodriguez's immediate supervisor, Dickinson, should have written the Thurston letter and conducted the performance counseling. Ramirez failed to adhere to those policies by taking those employment actions him-

self. Ramirez even told Dickinson that he was in charge of the performance counseling when she attempted to interject a comment at the meeting, precluding her from any participation. The majority discounts this evidence based on Ramirez's testimony that he took the actions because he was directly involved and Dickinson had only been Rodriguez's supervisor for a short period of time. However, as an appellate court, we are not to reconsider the credibility of the witnesses who testify. *See id.* Whether Ramirez's excuses were credible was an issue for the jury, and the jury chose to disbelieve him.

(4) *Discriminatory Treatment in Comparison to Similarly Situated Employees*

Rodriguez testified that another supervisor who was absent from the training session was not disciplined. Rodriguez further testified that the Thurston letter was issued despite her explanation that she was preparing a report for TPRS and despite Ramirez's admission that the LSC was required to cooperate with TPRS by law. The majority discounts the evidence that the other supervisor was not disciplined based on Ramirez's testimony that the other supervisor was a department head and not required to attend. However, whether Ramirez's explanation was credible was a decision to be made by the jury not by this court on appellate review. *See id.*

(5) *Evidence that the Stated Reason for the Adverse Employment Action was False*

Ramirez refused to consider Rodriguez's explanation regarding the lack of advance notice of the training and her need to work with the TPRS. However, Wilson, Ramirez's supervisor, decided that Ramirez had overreacted and that the Thurston letter should be removed from Rodriguez's file. The jury could infer from Ramirez's refusal to consider what Wilson determined to be a reasonable explanation that the reason Ramirez gave for issuing the Thurston letter was a pretense and that the letter was really issued in response to Rodriguez's report of the illegal conduct. In addition, Rodriguez subsequently was ranked below standards on her performance evaluation for failing to attend the training; however, Wilson had determined that the reason she gave for refusing to attend the training was valid in requiring the Thurston letter to be removed. As a result, the jury also could infer that the reason given for the below standards performance evaluations was a pretense.

Rodriguez introduced sufficient circumstantial evidence to support the jury's finding that the Thurston letter and the below standards performance evaluation would not have occurred when they did if she had not reported the illegal conduct. Because the majority holds to the contrary, I respectfully dissent.