**Bruce GORE, Appellant,**

v.

**SCOTLAND GOLF, INC. f/k/a Golfing Tease, Inc., Appellee.**

**No. 04–01–00548–CV.**

Court of Appeals of Texas,
San Antonio.

Feb. 28, 2003.

Rehearing Overruled June 9, 2003.

**28**

Gary M. Poenisch, San Antonio, for appellant.

R. Matthew Kyle, New Braunfels, Gary F. Churak, Law Office of Gary F. Churak, for appellee.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SANDEE BRYAN MARION, Justice.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

Opinion by CATHERINE STONE, Justice.

Appellant's motion for rehearing is denied. This court's opinion and judgment

dated January 8, 2003 are withdrawn, and this opinion and judgment are substituted. We substitute this opinion to clarify our discussion regarding the personal liability of Bruce Gore ("Gore").

Gore appeals a judgment rendered in favor of Scotland Golf, Inc. ("SGI") based on a jury finding that Gore had committed fraud against SGI in connection with an asset purchase transaction. On appeal, Gore contends the evidence is insufficient to support the jury's findings that Gore is personally liable for an actionable misrepresentation and to support the jury's award of damages and exemplary damages. We affirm the trial court's judgment.

## STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the finding, and we disregard all evidence and inferences to the contrary. *Texas Dept. of Mental Health and Mental Retardation v. Rodriguez,* 63 S.W.3d 475, 480 (Tex.App.-San Antonio 2001, pet. denied). If there is more than a scintilla of evidence to support the finding, the finding will be upheld. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). In reviewing a factual sufficiency point, we are required to weigh all of the evidence in the record. *Rodriguez,* 63 S.W.3d at 480. Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Be-

cause the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *Id.*

## EVIDENCE PRESENTED

Gore was the president and majority owner of Ocean Club, Inc.[1] Jeff Wilford, the owner of SGI,[2] sought to purchase a golf-related business. A business broker presented Wilford with a brochure containing a piece of equipment sold by Ocean Club called the Scotland loft and lie gauge (the "Gauge") and introduced Wilford to Gore. The Gauge adjusts the angles of golf clubs to fit an individual golfer's swing.

Gore told Wilford that Ocean Club sales were $400,000 to $600,000 annually, with a profit margin of 20%. The Gauge was Ocean Club's primary product, and Golf Smith, Inc. was Ocean Club's largest customer. Although Wilford knew that the Gauge had not been patented, Wilford testified that Gore told him that Ocean Club had exclusive rights to manufacture and sell the Gauge and that Ocean Club's relationship with Golf Smith was healthy. Golf Smith distributed golf-related equipment through catalogs and was the primary customer used by Ocean Club to distribute the Gauge in the market. Wilford testified that Gore advised him that to avoid making Golf Smith nervous, Gore would assist in the transition of ownership.

The asset sale was closed in July of 1997, and Gore and Wilford went to Golf Smith together to make the July delivery. Wilford testified that Gore never intro-

1. After the asset purchase transaction, Ocean Club, Inc. changed its name to Team Promotions, Inc.

2. Before the asset purchase transaction, SGI's corporate name was Golfing Tease, Inc. After the transaction, SGI's name was changed to Ocean Club, Inc., but SGI again changed its name due to creditor confusion over which Ocean Club was the debtor entity.

duced him to anyone at Golf Smith as the purchaser of Ocean Club's assets. Wilford testified that he would not have purchased Ocean Club's assets if Gore had not represented that Ocean Club's relationship with Golf Smith was healthy. Wilford further testified that Gore did not disclose that Golf Smith had threatened to drop the Gauge from its catalog or manufacture its own equipment to replace the Gauge. Wilford testified that Gore represented that SGI would receive the drawings, designs, specifications and engineering data relating to the Gauge; however, after closing Wilford discovered that only the companies which manufactured the Gauge for Ocean Club had any drawing related to the Gauge. In addition to the asset purchase agreement, SGI and Gore also entered into a consulting agreement pursuant to which SGI retained Gore's services to ease in the transition, and a non-competition agreement in which Gore agreed not to compete with SGI.

After the closing of the sale, Wilford testified that he was contacted by Frank McDermid, an individual who previously manufactured the Gauge for Ocean Club. McDermid met with Wilford and Gore, and Wilford testified that McDermid informed him that he intended to begin manufacturing the Gauge and would either sell it to SGI or someone else. After that meeting, Gore disclosed that he did not have a patent or other exclusive rights to manufacture the Gauge. Gore also told Wilford that Golf Smith had threatened to begin its own production of the Gauge and one other individual could also make the Gauge and compete with SGI.

In November 1997, Wilford was contacted by Ron Dust, a former employee and minority owner of Ocean Club. Ron was previously unaware of the sale to Wilford. Ron told Wilford that Golf Smith had informed Ocean Club that it did not intend to carry the Gauge in its catalog after January of 1998. A meeting was arranged with Golf Smith, and its representatives, Tom Wishon and Robert Bardelben, confirmed that Golf Smith would no longer carry the Gauge in its catalog. Wilford testified that sales of Gauge drastically fell in the years after Golf Smith stopped carrying the Gauge. SGI later developed a new product that Golf Smith began carrying in its catalog in April of 2000.

Robert Bardelben, a Golf Smith buyer, testified that Golf Smith had carried the Gauge for approximately four years. Bardelben also testified that Golf Smith carried two or three similar pieces of equipment in different price ranges. Bardelben testified that the decision not to carry the Gauge was probably made mid-year in 1997 because that was when those decisions were typically made. Bardelben testified that he never informed Gore that the Gauge was being dropped, but he was uncertain what information had been provided by other Golf Smith representatives. The decision to drop the Gauge was primarily based on Golf Smith's development of its own similar equipment. Bardelben testified that the sales of the Gauge after it was dropped from the catalog were to an overseas distributor and were different than its prior orders which had been made for purposes of inventorying the Gauge for catalog sales.

Frank McDermid testified that he developed the design for the Gauge. Gore approached McDermid with an idea to market the Gauge commercially. Although McDermid had drawings of the machine, McDermid testified that the Gauge could be taken to any good machine shop which could manufacture the Gauge from the sample without drawings. McDermid gave Gore exclusive rights to sell the Gauges McDermid manufactured, but McDermid admitted that he could not pre-

vent others from manufacturing the Gauge because it was not patented. McDermid also admitted that after he sold the machine shop, he could not require the new owners to give exclusive sales rights to Gore. McDermid testified that he met with Wilford and Gore in 1997, but McDermid denied that he said he was going back into the business of manufacturing the Gauge.

Ron Dust, Gore's brother-in-law, testified that before he left his employment with Ocean Club, Tom Wishon, a representative of Golf Smith, told Ron that Golf Smith was going to drop the Gauge from its catalog. Ron testified that he informed Gore, and the two men discussed future plans. Ron also stated that Golf Smith had previously threatened to make its own machine if Ocean Club could not provide acceptable pricing. Ron was a minority shareholder in Ocean Club, but he was not informed of the sale. After Ron discovered that the assets of Ocean Club had been sold to Wilford, he called Wilford inquiring about a job. Ron asked Wilford what he intended to do when Golf Smith was no longer a customer. Ron testified that Wilford was silent, and Ron realized that Wilford was unaware that Golf Smith was dropping the Gauge. Ron attended a meeting with Wilford and representatives of Golf Smith in an effort to salvage the customer relationship, but Golf Smith had already succeeded in manufacturing its own equipment to replace the Gauge. Golf Smith gave Wilford some ideas for new product development. Ron admitted that he was not on good terms with Gore when he resigned from Ocean Club.

April Dust, Gore's sister, who also had been employed by Ocean Club, testified that Golf Smith was Ocean Club's biggest equipment customer and the business could not be successful without Golf Smith. April testified that Gore had previously told her that the timing of Golf Smith manufacturing a competing machine was not a matter of "if," it was a matter of "when." April also testified that in filling an order from Golf Smith, another employee remarked that she hoped that the order was not the final order to tie Golf Smith over until Golf Smith's machine was made.

Gore testified that at the time of the sale to SGI, no drawings or designs existed for the Gauge other than the drawings the manufacturers may have had. Gore admitted that Golf Smith was the largest single customer for the Gauge, but Gore denied that he advised Wilford not to contact Golf Smith with regard to the transition. Gore testified that he was not aware that Golf Smith intended to drop the Gauge from its catalog. In response to whether Gore told Wilford that "it was only a matter of when and not if [Golf Smith] was going to drop [the Gauge]," Gore responded:

A. All customers are just that, they are a customer until they stop being a customer. I told him that our relationship with Golf Smith was a good relationship.

Gore testified that Golf Smith did not replace SGI's Gauge, it merely switched providers of the machine. Gore admitted that if he knew that Golf Smith intended to drop the Gauge from its catalog at the time SGI purchased the assets, the information should have been disclosed to SGI. Gore further admitted that he did not disclose that Golf Smith had threatened to manufacture its own machine and compete against Ocean Club in regard to the sale of the Gauge if Ocean Club failed to meet pricing requirements. Gore stated that he did not make the disclosure because the threat was made in 1994 and was a moot point. Gore later changed his response and stated that he had disclosed the threat to Wilford in a general sense. Gore stated that he informed Wilford of Golf Smith's pricing policy and that Golf Smith was a

demanding customer. Gore testified that the future of Ocean Club was developing new products. Gore further testified that he had originally offered to allow Wilford to purchase a minority interest in Ocean Club rather than its assets.

### PERSONAL LIABILITY

■ Gore contends that he cannot be found personally liable for any misrepresentation in connection with the asset sale because the jury failed to find Ocean Club, later called Team Promotions, personally liable as a corporation and because the evidence is insufficient to pierce the corporate veil. "[T]he longstanding rule in Texas is that '[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment.'" *Kingston v. Helm*, 82 S.W.3d 755, 758 (Tex.App.-Corpus Christi 2002, pet. filed) (quoting *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex.1984)); *see also Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, no pet.). "The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation." *Kingston*, 82 S.W.3d at 758; *see also Shapolsky*, 56 S.W.3d at 133. In an action seeking to hold an officer liable for his fraudulent statements, the corporate veil is not required to be pierced. *Kingston*, 82 S.W.3d at 766.

■ Gore contends that an exception to the general rule imposing personal liability should be made for cases in which a jury fails to find the corporation liable for the officer's misrepresentation. Gore relies on a case in which the court held that a corporate officer could not be held personally liable if a corporation enters into a contract that tortiously interferes with the business relationship of another entity.

*Pabich v. Kellar*, 71 S.W.3d 500, 506–08 (Tex.App.-Fort Worth 2002, pet. denied). In *Kingston*, the Corpus Christi court provides a detailed analysis regarding the reasons *Pabich* and other cases absolving a corporate agent from personal liability for tortious interference do not apply to a case based on fraud or misrepresentations. 82 S.W.3d at 761–64. We agree with this analysis. A jury's failure to find a corporation liable for a misrepresentation made by its officer does not absolve the officer from personal liability. *See id.* at 763–64. Accordingly, Gore is not absolved of his individual liability based on the jury's failure to find the corporation liable, and no evidence was required to be introduced to pierce the corporate veil.

■ Gore next contends that his alleged statements were mere opinion and were not actionable as misrepresentations. Although an expression of an opinion generally cannot support an action for fraud, "[a]n opinion may constitute fraud if the speaker has knowledge of its falsity." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). "Additionally, when an opinion is based on past or present facts, an action for fraud may be maintained." *Id.* In this case, after weighing the credibility of the witnesses, the jury could have determined that Gore knew that Golf Smith intended to drop the Gauge from its catalog, thereby knowingly misrepresenting that Ocean Club's relationship with Golf Smith was healthy. Alternatively, if Gore's statement is considered to be an opinion, the nature of Ocean Club's relationship with Golf Smith is necessarily based on the facts underlying that relationship, making the opinion actionable.

■ Gore also contends that his oral statements regarding the nature of the relationship with Golf Smith were made during negotiations and, therefore,

are not actionable. Gore relies on *U.S. Quest, Ltd. v. Kimmons,* 228 F.3d 399, 403 (5th Cir.2000), to support this contention. However, as noted by SGI in its brief, a subsequent written contract only precludes a fraud claim based on prior oral statements made during negotiations that are *inconsistent* with a specific contract provision. *See id.* Gore's statement that Ocean Club's relationship with Golf Smith was healthy is not inconsistent with the terms of the asset purchase agreement.

■■■■ Gore further contends that SGI was legally charged with the status of Ocean Club's relationship with Golf Smith because Wilford could simply have called Golf Smith to discover the actual nature of the relationship. Gore relies on *TIG Ins. Co. v. Sedgwick James of Wash.,* 184 F.Supp.2d 591, 603 (S.D.Tex.2001), to support this contention. However, in *TIG Ins. Co.,* the court held that the plaintiffs were legally charged with information contained in an insurance policy when they relied on a certificate of insurance that stated that the certificate was "issued as a matter of information only" and did not "amend, extend or alter" the policy coverage. 184 F.Supp.2d at 604. Given this disclosure, the court held that the plaintiffs should have taken the reasonable step of obtaining a copy of the actual policy to ensure coverage. *Id.* Unlike the open disclaimer in the certificate of insurance, the jury in this case could reasonably have found that Gore deliberately led SGI into not contacting Golf Smith. "[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). "[A]n independent legal duty, separate from the existence of the contract

itself, precludes the use of fraud to induce a binding agreement." *Id.*

■■■■ Finally, Gore contends that no evidence supports a finding that he made a misrepresentation with regard to the Non–Competition Agreement or the Consulting Agreement entered into as part of the asset purchase transaction. This contention ignores that the misrepresentation regarding the status of Ocean Club's relationship with Golf Smith underlies the entire asset purchase transaction of which the Non–Competition Agreement and Consulting Agreement were a part. Absent the misrepresentation, SGI would not have entered into the asset purchase transaction.

## DAMAGES AND EXEMPLARY DAMAGES

■■■■ Gore contends that the evidence is insufficient to support the jury's award of damages because there was no breach of the Non–Competition Agreement or the Consulting Agreement. Gore's contention ignores that the jury awarded the damages for which judgment was rendered based on Gore's fraud. SGI's fraud claim is separate from the contract itself and from any claim relating to the breach of that contract. *Formosa Plastics Corp. USA,* 960 S.W.2d at 47. "[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id.* Accordingly, SGI was not required to prove a breach of the Non–Competition Agreement or the Consulting Agreement to recover damages for Gore's misrepresentations.

■■■■ Gore further contends that the evidence is insufficient to support the jury's award of exemplary damages. The Civil Practice and Remedies Code requires

a plaintiff seeking the recovery of exemplary damages to prove by clear and convincing evidence that the harm with respect to which the claimant seeks recovery resulted from fraud. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(1) (Vernon 1997). For exemplary damages purposes, clear and convincing evidence is defined as that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Foley v. Parlier*, 68 S.W.3d 870, 880 (Tex. App.-Fort Worth 2002, no pet.).

Gore relies on his own testimony as evidence of knowledge that SGI obtained during negotiations; however, the jury was free to evaluate the credibility of the witnesses and disbelieve all of Gore's testimony. Accordingly, based on Wilford's testimony, the jury could have found that Gore failed to disclose anything regarding Ocean Smith's relationship with Golf Smith other than his statement that the relationship was healthy. Based on the testimony of Ron and April Dust, the jury could also have found that Gore knew that Golf Smith intended to drop the Gauge from its catalog either in 1998 or whenever it had developed its own comparable machine. This testimony was sufficient to produce in the mind of the jury a firm belief or conviction that the harm to SGI resulted from Gore's fraud.

## CROSS-POINTS

In its first cross-point of error, SGI contends that the trial court erred in over-ruling its motion for partial JNOV because the evidence supported a finding that Ocean Club or Team Promotions also defrauded SGI and breached the contract. In its second cross-point of error, SGI contends that Gore failed to preserve his complaints for appellate review.

 Because SGI's first cross-point seeks to alter the trial court's judgment, SGI was required to file a notice of appeal in order for this court to have jurisdiction to consider this complaint. *See* TEX.R.APP. P. 25.1(c) (party seeking to alter judgment must file notice of appeal). SGI did not file a notice of appeal; therefore, we do not have jurisdiction to consider SGI's first cross-point.

 SGI's second cross-point does not seek to alter the trial court's judgment but simply contends that Gore did not preserve his complaints for appellate review. Gore timely filed a motion for judgment notwithstanding the verdict and a motion for new trial. These motions adequately preserved his sufficiency complaints. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991); TEX.R. CIV. P. 324(b)(2).

## CONCLUSION

The trial court's judgment is affirmed.