



## MEMORANDUM OPINION

No. 04-09-00050-CV

**IN THE ESTATE OF CLIFFORD EUGENE EVERETT**, Deceased

From the County Court at Law, Val Verde County, Texas
Trial Court No. 5688
Honorable Sergio J. Gonzalez, Judge Presiding

Opinion by:  Rebecca Simmons, Justice

Sitting:  Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Rebecca Simmons, Justice

Delivered and Filed:  October 13, 2010

AFFIRMED

This appeal arises out of a will contest surrounding the disposition of the Estate of

Clifford Eugene Everett (Cliff).  Cliff executed three wills dated: March 21, 2006 (the first will),

April 13, 2007 (the second will), and April 24, 2007 (the third will).  After Cliff's death, his

oldest son, Appellant Joe Everett, filed an Application to Probate Will and For Issuance of

Letters Testamentary regarding the third will.[1]  Appellee James McIntire, Cliff's step-grandson,

filed an Opposition to Probate the Will, and filed an Application to Probate Will and For

Issuance of Letters Testamentary regarding the first will.  The jury found that Joe procured the

---

[1]  Geneie Everett, one of Cliff's daughters, sought to probate a copy of the second will, the original of which was never located.  The jury found that the will dated April 13, 2007 was not a true and correct copy of the original will. Based on the jury's answer, they did not answer additional questions pertaining to fraud and undue influence regarding the second will.  The trial court denied probate of the second will, and no one appeals this decision.

third will by undue influence and fraud. On appeal, Joe argues the evidence presented was neither legally nor factually sufficient to support the jury's findings. We affirm the judgment of the trial court.

## FACTUAL BACKGROUND

Cliff was seventy-nine years old when he died. He had four children from his first marriage, Geneie, Joe, Geri, and Janet, and four step-children with his second wife. Over the years, Cliff spent a great deal of money and energy developing and operating the Holiday Travel Park (the Park) in Del Rio. By all accounts, Cliff did not see his children regularly, and none of his children exhibited any interest in taking over the Park. Although Gary, Cliff's step-son, worked at the Park from time to time, it was Gary's son, James, who assisted Cliff in the daily operations. In fact, in the last six years of his life, Cliff relied more and more on James to run various phases of operations. Moreover, there was significant testimony that James and Cliff had a "close relationship" based substantially on James's help with the day-to-day operations at the Park. In contrast, Joe testified that he did not see his father regularly and that prior to Cliff's hospitalization in April of 2007, Joe had not seen his father since 2002.

Cliff's health began to seriously decline in the spring of 2007. He suffered from congestive heart failure, and was in and out of the hospital with pneumonia and other issues. In March and April he began having colon problems. On August 13, 2007, Cliff's doctors in Del Rio performed a colonoscopy-type procedure. Based on continued problems, Cliff was transferred to a hospital in San Angelo for further treatment and underwent surgery for a colon problem on April 24th. Cliff never recovered from the surgery and subsequently died on May 9, 2007.

## A. The Wills

At trial, all three wills were presented to the jury. The first will, executed March 21, 2006, was prepared by a local attorney and devised $100.00 to each of Cliff's four children and four step-children, with the residuary estate to James.[2] The residuary estate included ownership of the Park, the source of this dispute. The second will, executed April 13, 2007, was prepared by Geneie's husband and devised Cliff's entire estate—including the Park—equally between James and Cliff's four children: Joe, Geneie, Geri, and Janet, with each receiving a 20% share. The second will appointed Geneie as independent executor of the estate. The third will, executed April 24, 2007, and prepared by Joe's wife, had the same disposition as the second will, but James and Joe were named as co-executors.

## B. The Jury Verdict

With respect to the third will, the jury found it was procured by undue influence and fraud by Joe. Accordingly, the trial court denied probate of the third will, and admitted the first will to probate and issued Letters Testamentary to James.[3] Joe subsequently filed a motion for new trial challenging the sufficiency of the evidence of undue influence and fraud. The trial court denied Joe's motion for new trial.

### STANDARD OF REVIEW

An appellate court reviews a legal sufficiency point by reviewing the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). Additionally, we credit favorable

---

[2] James testified Cliff intended that James disburse additional funds to each of Cliff's children and step-children from his second marriage. According to James, following any necessary repairs to the Park and taxes to be paid, he was under the impression that each of the children and step-children would receive payments in the amount of $75,000.00 over the course of a few years.

[3] The trial court likewise denied probate of the second will based on the jury's finding that the document presented to them at trial was not a true and correct copy of the will. Again, no one complains on appeal about this finding or the effect of signing the second will may have had on the first will.

evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not.  *Id*. at 827; *accord Ingram v. Deere*, 288 S.W.3d 886, 893–94 (Tex. 2009).

In evaluating a factual sufficiency challenge, we consider and weigh all of the evidence and determine whether the evidence in support of a finding is so weak as to be clearly wrong and unjust.  *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co*., 715 S.W.2d 629 (Tex. 1986).  The review considers both the evidence supporting and contrary to the judgment.  *See Dow Chem.*, 46 S.W.3d at 242; *Plas-Tex, Inc. v. U.S. Steel Corp*., 772 S.W.2d 442, 445 (Tex. 1989); *Madrigal*, 115 S.W.3d at 34 (citing *Tex. Dep't of Mental Health & Mental Retardation v. Rodriguez*, 63 S.W.3d 475, 480 (Tex. App.—San Antonio 2001, pet. denied)).  Additionally, we remain cognizant that the jury is the sole judge of witnesses' credibility.  *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## UNDUE INFLUENCE

At trial, James sought to set aside Cliff's third will based on the undue influence of Joe. Generally, to justify setting aside a will because of undue influence, a contestant must prove the (1) existence and exertion of an influence (2) that subverted or overpowered the testator's mind at the time he executed the instrument (3) so that the testator executed an instrument he would not otherwise have executed but for such influence.  *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *see also In re Estate of Lathem*, No. 11-04-00041-CV, 2005 WL 2036563, at *8 (Tex. App.—Eastland Aug. 25, 2005, pet. denied); *Cobb v. Justice*, 954 S.W.2d 162, 165 (Tex. App.—Waco 1997, pet. ref'd).  In this case, however, the parties disagree as to the relevant factors this court must consider in our review of the evidence to support the jury's undue influence finding.

Joe argues the evidence should be weighed under the *Rothermel* factors set forth above. *Rothermel*, 369 S.W.2d at 922. James, on the other hand, asserts that we must measure the sufficiency of the evidence against the jury charge actually given to the jury when the opposing party fails to object to the charge. *Ingram v. Deere*, 288 S.W.3d 886, 905 (Tex. 2009); *see also Crone v. Brumley*, 219 S.W.3d 65, 68 (Tex. App.—San Antonio, 2006, no pet.). In the present case, the jury charge was specifically directed to the undue influence of Joe, and instructed the jury as follows:

> "Undue Influence" as used in the preceding question, is such influence or domination by excessive importunities, imposition of fraud exercised at the time of the making of said instrument as destroys the free agency of the testator and overcomes his wishes in regard to the disposition of his property to such an extent that the instrument does not in fact express his wishes as to the disposition of his property, but those of the person exercising such influence. It may stem from fear, the desire for attention or peace, or some other feeling that the testator is unable to resist. . . . you may consider the condition of the testator's mind, age, weakness of body or mind if any, whether produced by the infirmities of his age or by disease; and the opportunity to exert undue influence.
>
> In determining if there was undue influence you may also consider the following:
>
> 1.  The circumstances surrounding the execution of the instrument;
> 2.  The relationship of the testator and recipients of the bounty;
> 3.  The motive, character, and conduct of the persons benefitted;
> 4.  The opportunity of the beneficiary to influence the testator;
> 5.  The beneficiary's participation in the drafting and execution of the instrument;
> 6.  The words and acts of the parties;
> 7.  The improvident, unjust, unreasonable, and unnatural disposition of the property.

Because the jury's undue influence finding was made against only Joe, and Joe did not object to the charge as given, the sufficiency of the evidence is measured against the charge of the court. *Ingram*, 288 S.W.3d at 905. In reviewing the no-evidence issue, we must, therefore, consider evidence supporting the finding of undue influence, as defined by the jury charge, and uphold

that finding if there is more than a scintilla of evidence in support thereof. *City of Keller*, 168 S.W.3d at 810.

## B.  The Evidence

In determining the existence of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.—Houston [14th Dist.] 1992, writ denied). We, therefore, look at the circumstances within a reasonable time of the April 24th execution of the third will.  According to testimony, the execution of the third will was a more formal version of the second will that was executed a mere eleven days before the third will.  Consequently, we will examine the circumstances leading to the execution of both the second and third wills.

Much of the testimony at trial focused on Cliff's obsession with the Park.  The Park was clearly a focus of Cliff's life, and he desperately wanted the Park to remain intact after his death. In March of 2006, while in good health, Cliff executed the first will leaving the Park to James. At trial, Cliff's closest friends, JoAnn Ellis, Bobby Smalley, and Bill Clucas confirmed Cliff's intention to leave the Park to James.

### 1.  Circumstances Surrounding the Second Will

Following Cliff's admission to the Del Rio hospital on April 8, 2007, James called Geneie and informed her of Cliff's admission.  After arriving at the hospital on the 12th, Geneie and James went to dinner.  Unbeknownst to James, that night Geneie's husband drafted a two page will, from internet sources, for Geneie to present to Cliff the following day.  The next day, Geneie told James not to come to the hospital as Cliff was tired from a colonoscopy-type procedure, and did not want to see anyone.  However, within hours after Cliff's sedation for the

procedure, Geneie presented Cliff with the second will that devised Cliff's estate, including the Park, equally among his children and James, with Geneie as the executor.

James learned of the new will only after Geneie called the Park searching for a notary. This news prompted James to go to the hospital. Prior to the execution of the second will, it is undisputed that Geneie told Cliff about a friend that had to pay a 50% inheritance tax. Cliff was surprised by the large amount. Geneie also told James, in Cliff's presence, that as the devisee of the entire interest in the Park, James would have to come up with $500,000.00, or sell the Park. Geneie asked James where he was going to come up with the money. James testified that his grandfather cried over Geneie's remarks.[4] After Geneie informed James that Cliff was executing a new will, Cliff reassured James that nothing was going to change regarding the Park because his children did not want anything to do with the business. Cliff also told James that Joe and Geneie were trying to figure out what to do about the inheritance tax. James never read the will. Based on Geneie's request, James proceeded to contact two of Cliff's friends to witness the execution of the will.

Bobby Smalley witnessed Cliff execute the second will. He described the execution as being under the direction of Geneie, and as a "hurry up job," because there was an air of immediacy surrounding the execution of the will. Bobby described Cliff as fairly meek; he was ill and not his usual self. Significantly, after the signing, Cliff reconfirmed to Bobby that he intended to give the Park to James. Richard Scoggins, another of Cliff's friends, and witness to the execution, testified that Geneie and her husband appeared to be directing the signing of the second will.

---

[4] At trial one of the exhibits reflected the estate taxes actually amounted to approximately $50,000.00, significantly less than what Geneie told Cliff they would be. *See Holcomb v. Holcomb*, 803 S.W.2d 411, 415 (Tex. App.—Dallas 1991, writ denied) (testator mislead by beneficiary).

## 2. *Circumstances Surrounding the Third Will*

Cliff's health continued to deteriorate, and he was moved to a hospital in San Angelo. Eleven days after Cliff signed the second will, Joe presented Cliff with a third will, this time prepared by Joe's wife, which again devised Cliff's estate equally among his four children and James. As opposed to the second will, which followed a colonoscopy-type procedure, the execution of the third will occurred thirty minutes prior to Cliff's unsuccessful surgery that ultimately led to his death. Joe arranged for the witnesses and notary to be present at the hospital for the execution. *See In re Estate of Riley*, 824 S.W.2d 305 (Tex. App.—Corpus Christi 1992, writ denied) (beneficiary obtained pre-printed kit day before surgery leaving all property to her). The execution of the third will was never revealed to James prior to Cliff's death. *See Tieken v. Midwestern State Univ.*, 912 S.W.2d 878, 886 (Tex. App.—Fort Worth 1995, no writ) (kept testator isolated from friends and other influences).

One of Cliff's close friends, Bill Clucas, testified that contrary to the terms of the second and third wills, Cliff often talked about his desire for James to take over the Park. Bill arrived at the hospital within a half-hour of Cliff's execution of the third will. As the hospital staff was taking Cliff to surgery, Bill described Cliff as "sedated" and further relayed that he was not even sure that Cliff recognized him. Contrary to Joe's assertion that nothing would change, immediately after Cliff's death, Joe and Geneie fired personnel, changed bank accounts, and changed locks at the Park.

## 3. *Condition of the Testator's Mind and Body*

The record reflects that during the month of April, 2007, Cliff was very ill and in a lot of pain. He spent most of April in the ICU unit at the hospitals in Del Rio and San Angelo. He had been told that he could survive with a colostomy procedure, or he could undergo a very

dangerous surgical procedure that most likely would cause his death. He did not want to die, but he chose the more dangerous surgery. Cliff signed the second will while in the ICU resting after a colonoscopy, and signed the third will shortly before heading into surgery that he most likely would not survive. The family was aware of Cliff's overarching desire to keep the Park intact and under the control of James. Cliff was obviously concerned about the taxes on the property, particularly after Geneie made the representation that the taxes could amount to $500,000.00— far more than James could pay without having to sell the Park.

### 4. Relationship of the Testator and Recipients of the Bounty and the Motive and Conduct of the Persons Benefitted

At the time of his death, Cliff had a close relationship with James, but did not have one with his biological children, and he had not even seen Joe in approximately five years.[5] In contrast, several of Cliff's friends confirmed Cliff's close relationship with James. JoAnn Ellis testified that she visited Cliff regularly during his last months. Cliff confirmed to JoAnn his intention that the Park go to James after his death. Cliff's friend, Bobby Smalley, testified that after the execution of the second will, he discussed Cliff's intentions for the Park around the time Cliff signed the third will. Cliff told him he did not want the Park sold and was just going to let James take over the Park. Bobby understood that Cliff had prepared a will giving everything to James. James testified that he worked hard at the Park and saw his grandfather almost every day. They discussed the Park extensively and the plans to expand and improve the Park. He was under the impression that the Park would be left to him.

### 5. Analysis

We remain cognizant that the exertion of undue influence is usually subtle, and by its very nature usually involves an extended course of dealings, contacts, and circumstances. Under

---

[5] During trial, Joe and Geneie confirmed that they each charged and received from Cliff's estate $10,000 for the time they spent with Cliff in the two weeks before his death.

the charge given in this case, the trial court instructed the jury to consider a number of factors including an individual's weakness of mind and body, whether produced by advanced age or illness, as evidence of the individual's susceptibility to be influenced. *See In re Estate of Lathem*, 2005 WL 2036563, at *9–10. The evidence, however, must show more than merely the opportunity to exert influence, but that, in fact, influence was exerted with respect to the making of the testament itself. *Id*.; *compare Cobb*, 954 S.W.2d at 165–66 (beneficiary had decedent traveling to attorney's office, then to insurance company to change insurance policies, then back to attorney's office, all without necessary oxygen, decedent lapsed into a coma died the following day), *with Guthrie*, 934 S.W.2d at 832 ("A testatrix's weakened physical and mental condition is only indicative of her susceptibility to influence; it is no evidence that such influence exists in fact."). When enough evidence is before the fact-finder that reasonable minds could differ on the meaning of the evidence or the conclusions or inferences to be drawn from that evidence, the court may not substitute its judgment for that of the jury. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

The evidence surrounding the execution of the wills is conflicting, and the jury could believe or disbelieve the witnesses based on the opportunity to observe the witnesses' demeanor. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. In our analysis, we turn to the elements as outlined in the jury charge. James argues that the circumstances surrounding the execution of the second and third wills, supports the jury's verdict. The evidence supports that Geneie played on Cliff's anxieties regarding inheritance taxes and the potential that such taxes would necessitate the sale of the Park. Because the second will was only two pages and lacked formalities, Joe's wife drafted a third will with identical dispositions for Joe to present to Cliff before his surgery

on the 24th. Joe was in a position to influence Cliff, who was clearly upset about his medical condition and concerned about whether he would even survive the surgery.

Additionally, the close proximity in time of the second and third wills, and the fact both wills were drafted by a beneficiary's spouse, support the jury's findings of undue influence. There is little question that both Geneie and Joe, neither of whom were very close to their father, stood to benefit from both the second and third wills, and participated in both the drafting and the execution thereof. *See Peralez v. Peralez*, No. 13-09-259-CV, 2010 WL 2543894, at *6 (Tex. App.—Corpus Christi Jun 24, 2010, no pet. h.)*; In re Estate of Reno*, 06-09-00040-CV, 2009 WL 4877542, at *8 (Tex. App.—Texarkana Dec. 18, 2009, no pet.) (focusing on the daughter's involvement in the preparation of the self-serving will); *Lathem*, 2005 WL 2036563, at *9–10; *In re Estate of Richardson*, No. 11-92-180-CV, 1993 WL 13141661, at *203 (Tex App.—Eastland July 1, 1993, no writ).

The testimony of Cliff's close friends reveals Cliff's intentions to leave the Park to James, and the weakness of Cliff's body and mind support the jury's finding, as well as the conclusion that Cliff was susceptible to undue influence. *See In re Estate of Lathem*, 2005 WL 2036563, at *9. Reviewing the evidence in its entirety, the testimony could reasonably have led a jury to conclude that Joe exercised undue influence over Cliff in the execution of the third will. *See Kutchinsky v. Zillion*, 183 S.W.2d 237, 239 (Tex. Civ. App.—Galveston 1944, writ ref'd w.o.m.); *see also Lowery v. Saunders*, 666 S.W.2d 226, 234 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (holding that it is proper to receive evidence of all relevant matters that occurred within a reasonable time before or after execution of the will being offered). Looking at the evidence supporting the jury's verdict, we conclude that there is more than a scintilla to support the conclusion that the third will was procured by undue influence. *Madrigal*, 115 S.W.3d at 34.

There was conflicting testimony before the jury including testimony that sometime before his death, Cliff and his step-grandson James had a disagreement that strained their relationship. Both Geneie and Joe testified that their father told them what to put in the wills and the second and third wills reflect their father's desires. After reviewing both the supporting and contrary evidence, the record supports the jury's findings and is not so clearly wrong and manifestly unjust to warrant a reversal. *Id.* at 34. We, therefore, overrule Joe's legal and factual sufficiency challenges with regard to undue influence.

## FRAUD

Joe next contends that the evidence was neither legally nor factually sufficient to support the jury's finding that the third will was procured by fraud. Because we hold there is factually and legally sufficient evidence to uphold the jury's finding of undue influence we need not address the issue regarding the jury's finding of fraud. *See* Tex. R. App. P. 47.1 (requiring concise opinions addressing only those issues "necessary to final disposition of the appeal").

## CONCLUSION

The testimony of Cliff's close friends reveals Cliff's intention of preserving the Holiday Travel Park and bequeathing the same to James. As we previously stated, undue influence is often shown by subtle and multiple circumstances. Here, the jury could reasonably rely on: (1) the close proximity in time of the second and third wills; (2) the fact both wills changed the disposition of Cliff's estate; (3) the plethora of witnesses' testimony that Cliff's body and mind were weakened when both wills were signed; (4) Geneie and Joe's involvement in the preparation and execution of the second and third wills; and (5) Geneie and Joe's motive, character, and conduct surrounding the incidents in question.

Based on a review of the evidence supporting the jury's verdict, we conclude that there is more than a scintilla to support the conclusion that the third will was procured by undue influence. After reviewing both the supporting and contrary evidence, the record supports the jury's findings and is not so clearly wrong and manifestly unjust to warrant a reversal. We, therefore, hold that the evidence presented was legally and factually sufficient to support the jury's finding that the third will was procured by undue influence. Accordingly, the judgment of the trial court is affirmed.

Rebecca Simmons, Justice